NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11376


COMMONWEALTH  vs.  ANTHONY EUGENE JESSUP.



Hampden.      December 5, 2014. - April 8, 2015.

Present:  Gants, C.J., Cordy, Botsford, Lenk, & Hines, JJ.


Homicide.  Firearms.  Felony-Murder Rule.  Constitutional Law,
    Imprisonment, Freedom of speech and press.  Wanton or
    Reckless Conduct.  Robbery.  Practice, Criminal, Capital
    case, Motion to suppress, Instructions to jury, Assistance
    of counsel.



Indictments found and returned in the Superior Court
Department on July 30, 2010.

A pretrial motion to suppress evidence was heard by
Constance M. Sweeney, J., and the cases were tried before
Richard J. Carey, J.


Elaine Pourinski for the defendant.
Deborah D. Ahlstrom, Assistant District Attorney, for the
Commonwealth.


HINES, J.  In the early morning hours of May 30, 2010,

Jonathan Santiago was shot and killed as he sat in his vehicle

parked near a Springfield sports bar.  The defendant was

indicted for the shooting, and a jury convicted him of murder in

the first degree on the theory of felony-murder (with attempted armed robbery as the underlying felony), unlawful possession of a firearm, and unlawful possession of a loaded firearm.[1,2] Represented by new counsel on appeal, he argues (1) error in the denial of his motion to suppress a letter he wrote to another detainee while he was detained awaiting trial; (2) that a substantial likelihood of a miscarriage of justice arose from the trial judge's failure to instruct on involuntary manslaughter; and (3) that his trial counsel was ineffective in not requesting an instruction on involuntary manslaughter based on wanton or reckless conduct. We affirm the order denying the defendant's motion to suppress as well as the defendant's convictions, and discern no basis to exercise our authority pursuant to G. L. c. 278, § 33E.

Background. Based on the evidence adduced by the Commonwealth at trial, the jury could have found the following facts. On May 29, 2010, the victim met up with his friends,

---

[1] The defendant also was convicted of armed assault with intent to rob, which was dismissed as duplicative of the predicate felony underlying the felony-murder conviction, and of unlawful possession of ammunition, which was dismissed as a lesser included offense of unlawful possession of a loaded firearm.

[2] The defendant was tried together with Jason Jamal Stovall, who was charged with the same offenses as the defendant, but as an aider and abettor or joint venturer, see Commonwealth v. Zanetti, 454 Mass. 449, 466-467 (2009). The jury found Stovall not guilty on all charges against him.

Andrew Cooke, Marquis Chase, Kasheef Sheppard, Timothy Henderson, and Alan Bamber, outside a sports bar in Springfield where Virgil Vargas was celebrating her twenty-first birthday.[3] Vargas previously had attended high school in Springfield with the victim, the defendant, and James Jamal Stovall, who was tried with the defendant. Stovall was her friend. She spoke with Stovall and the defendant outside the bar about fifteen to twenty minutes before the shooting.[4] According to Vargas, both men wore black hooded sweatshirts, and hats.[5] The defendant's braided hair was visible under his hat. At the time of the shooting, which Vargas estimated had occurred at approximately 12:35 A.M., she had returned inside the bar.

The victim, who was wearing a "long, big chain," was parked in a lot across the street from the bar. He waited by the trunk

---

[3] Virgil Vargas had promoted the party on social media sites.

[4] Others saw the defendant and Stovall in the area outside the bar before the shooting. Andrew Cooke, who previously had worked at a restaurant with Stovall and "knew of" the defendant, testified that he saw the defendant and that the defendant was wearing a black "pilot's" jacket and a black baseball cap. He did not "get a good look" at Stovall. Marquis Chase also saw the defendant and Stovall before the shooting. Chase testified that the defendant was wearing a black sweatshirt and hat and had braided hair, and that Stovall was wearing a black sweatshirt. Another person present testified that he saw the defendant and Stovall before the shooting and that both were wearing hooded sweatshirts and one wore a hat.

[5] In her invitations to her party, Vargas had asked people to wear black clothing.

of his automobile while some of his friends were deciding whether to stay or leave. When the group decided to leave, Cooke approached the victim, who was then seated in the driver's seat of his automobile, to inform him.

The testimony varied about what happened next. Cooke testified that when he reached the victim's automobile, he leaned over to speak with the victim through the front driver's side window, which was partially opened. As Cooke was doing so, he heard a sound and turned back toward it. He saw a light-skinned African-American male,[6] with braids, a hat, and a "pilot's" jacket approach from behind with a gun. The person put the gun into the rear driver's side window, and stated, "Give me some money," or "Give me what you have."[7] Cooke testified that he heard a gunshot, saw the victim's automobile back up and then move forward, and then heard the automobile crash into a fire hydrant. Cooke did not see anyone else at or approaching the victim's automobile.[8,9]

---

[6] Cooke testified that he only saw part of the shooter's face, namely, the shooter's chin.

[7] After the shooting and while at the scene, Cooke told one officer that the shooter had pointed the gun at the victim and ordered the victim to get out of the automobile and then pointed the firearm at him (Cooke).

[8] During his cross-examination, Cooke acknowledged that he told a police officer that there might have been someone on the other side of the automobile.

Chase testified that just before the shooting, Cooke was speaking to the victim through the driver's side window. Chase heard someone say, "Open the door or I'll kill you." He went to see what was going on and saw a black male with braids[10] behind Cooke with his arm inside the rear driver's side window of the victim's automobile (but did not see a gun). Chase testified that he observed another person, who also was a black male, standing by the passenger's side mirror of the victim's automobile. Chase heard a gunshot and then observed the victim's automobile travel in reverse, eventually crashing into a fire hydrant. Chase testified that after the shooting, the two men who had approached the vehicle took off running across the street.[11]

Another individual who was present, Kashawn Harris, testified that he knew Stovall from high school and was familiar with the defendant. After Harris learned that his friends were going to leave and not attend the party, he went back to his automobile. He heard yelling and turned around. Harris saw a light-skinned black male in dark clothing on the driver's side

---

[9] At trial, Cooke made an in-court identification of the defendant as the shooter.

[10] Chase testified that he did see some of this man's face.

[11] When Chase first spoke with police, he did not mention Cooke's presence or that anyone was in the area of the passenger's side door.

of the victim's automobile reaching into the automobile and another person in dark clothing running up on the other side of the automobile. He saw the person on the passenger's side of the automobile touch the roof and a door. From the direction of the victim's automobile, he heard a shot, and he then saw the victim's automobile move and crash into a fire hydrant. Harris could not recall whether the victim's automobile moved before the shot was fired, but the two occurrences were close in time. He testified that after the shooting, the two people he had seen by the victim's automobile took off running across the street.

After the shooting, the victim's friends rushed over to his automobile, and Chase and Henderson entered the vehicle and tried to revive him. The scene was chaotic with people running and screaming.

Police and medical response personnel arrived at the scene within minutes. The victim died as the result of a gunshot wound to his back and chest. The medical examiner who conducted the autopsy testified that the victim had an entrance wound in the middle of the left side of his back. The bullet traveled through his left lung, which collapsed; went through his aorta, a major blood vessel; and exited through his upper right chest. The track of the wound was left to right, and back to front. Although the victim suffered other injuries to his face, the gunshot wound caused his death. The medical examiner also

opined that the gunshot wound was not one which would have resulted from a gun being fired from within two inches of the victim, so that the wound could not be characterized as a contact or close contact wound.

Police searched the area. One officer found a discharged nine millimeter cartridge casing which he opined likely would have been fired from a semiautomatic weapon. No weapon was ever recovered.

The victim's automobile subsequently was processed for the presence of fingerprints. Fingerprints taken from the front and rear passenger's side windows matched those of Stovall. Fingerprints removed from other areas inside and outside the automobile matched those of Henderson and Chase. There were no fingerprints matching the defendant's.

Police took statements from various people who were present at the time of the shooting. They brought several people to the police station to view (separately) photographs of possible suspects.

One officer, based on a description that Chase had given of the shooter, generated about 900 photographs of possible suspects through a computer search. The officer asked Chase to view the suspects on the computer, which displayed about twelve photographs per screen. After viewing approximately 300 photographs, Chase selected the defendant's photograph,

identifying him as the shooter. At this point, the police learned the defendant's name.

Cooke told Springfield police Sergeant Kevin Devine that the shooter was a light-skinned black male between five feet, four inches and five feet, seven inches; wore a black baseball cap with a "B" on it; wore a dark-colored coat; and had braids to the back of his neck. Cooke testified that he also told police that the shooter had a moustache and some markings on his face. Cooke was not able to positively identify the defendant from any photographs shown to him on a computer screen, but later from a photographic array of eight individuals he selected three photographs depicting individuals who bore a resemblance to the shooter, one of which was a photograph of the defendant. Cooke stated that if he were to see the shooter in person, he would be able to make a positive identification.

On May 31, Cooke returned to look at a photographic array,[12] but was not able to make an identification. Again, he pointed to one photograph (of the defendant), stating that the person resembled the shooter.

In the early afternoon of June 1, Cooke, Bamber, Sheppard, and Chase went to a park to go swimming. While there, they saw the defendant and his girl friend. Cooke "stopped dead in his

---

[12] This photographic array contained the same subjects as the earlier one referenced, but displayed a profile view of those subjects.

tracks" when he saw the defendant. Someone asked, "Is that him?" to which Cooke replied that it was.[13] Cooke's friends then attacked the defendant, who eventually was able to escape. Later, Cooke contacted Sergeant Devine and went to the police station; there, looking at a different photograph array containing eight photographs, Cooke positively identified a photograph of the defendant as the person who had shot the victim.

Police had Chase return to the police station to view a photographic array containing eight photographs. Chase selected the defendant's photograph from the array and stated that the person depicted therein was one of the two men at the victim's automobile at the time of the shooting. From a different photographic array, Chase also identified one of the two men as Stovall.

Police also had Harris view photographic arrays on June 1. From an array, Harris selected the defendant's photograph as depicting the person on the driver's side of the victim's automobile and, from another array, selected Stovall's photograph as being one of the two men who fled from the victim's automobile after the shooting. At trial, Harris testified that, at the time of the shooting, he had not seen the

---

[13] Cooke testified that it was his cousin Chase who had asked this question, but Chase denied it at trial.

faces of the men who had approached the victim, but had assumed from the clothing worn by the men who had been by the victim's automobile that the men were the defendant and Stovall.

After the encounter with the victim's friends, the defendant and his girl friend fled Massachusetts.  They were apprehended in Virginia on June 2, the next day, and detained at the Southside regional jail (jail) in Emporia, Virginia, pending extradition to Massachusetts.  While awaiting extradition, the defendant sent his girl friend, who also was being detained at the same facility, a letter that was the subject of the motion to suppress.  The Commonwealth introduced a redacted portion of this letter at trial as admissions of the defendant as well as consciousness of guilt evidence.  In the letter, the defendant stated:

> "I hated being broke.  I mean the lights got cut off, there was no cable, . . . gas, . . . et cetera.  I wanted to do so much with so little and it didn't help, you kept reminding me that I wasn't shit and I didn't have shit.  I . . . felt worthless and it hurt, so it caused me to not think clearly and to go out and do some dumb shit.

> "But I got good news, I'm not going to do life, first the bullet didn't kill him, the accident did, and second, they don't have any evidence just those stupid school kids saying I did it, but you know how that is that.  All I know is that I was driving with you all day and left and went home, so I don't know what them kids are talking about.

> "I'm going to beat this case so stick by me please and then we can move if you want and start a new life, I swear. I don't know about you, but I was kind of glad this shit happened because we went on a road trip together.  I was so

excited to go to ATL with you.  I couldn't wait to start over."

Neither the defendant nor Stovall testified.  The defendant presented a case of misidentification.  His former attorney testified that while interviewing Sheppard on May 20, 2011, Sheppard stated that he had spoken with Chase, Bamber, and Cooke before they were interviewed at the police station on the morning of the shooting and that none of them had seen who shot the victim.  The defendant's trial counsel argued that the identifications made by Harris, Cooke, and Chase were not credible.  Defense counsel also underscored the absence of physical evidence connecting the defendant to the crime and argued that the defendant had to flee the Commonwealth for his own safety.

Discussion.  1.  Motion to suppress.  Prior to trial, the defendant filed a motion to suppress two letters, one that he sent to, and one he received from, his girl friend, while both the defendant and his girl friend were being held pending extradition to Massachusetts.  The Virginia authorities seized the letters under the jail's policy prohibiting inmate-to-inmate correspondence without prior approval.  The defendant argued that the letters were seized in violation of the First Amendment to the United States Constitution, as applied to the States through the Fourteenth Amendment to the United States

Constitution.  After conducting an evidentiary hearing, a judge denied the motion.

One witness, Lieutenant Richard Miles, an employee of the jail, testified at the evidentiary hearing on the motion.  We recite the facts found or implicitly credited by the motion judge, supplemented by additional undisputed facts where they do not detract from the judge's ultimate findings.  See Commonwealth v. Isaiah I., 448 Mass. 334, 337 (2007), S.C., 450 Mass. 818 (2008).

On June 2, three days after the murder and the next day after the encounter with the victim's friends, the defendant was arrested in Virginia.  His girl friend was with him at the time and, shortly thereafter, also was arrested on an outstanding warrant.  At the jail, the defendant and his girl friend were held in separate units based on their gender.  Male and female inmates were not permitted to communicate with each other.  The jail's written policy precluded inmate-to-inmate correspondence by mail without prior approval.[14]  Inmates were notified of this policy, among others, when they were admitted to jail.  The policies and procedures of the jail were established to ensure safety and security.

---

[14] Specifically, the policy provided:  "Inmate to inmate correspondence within the facility will only be approved when a prior family relationship is verified."

On June 17, 2010, Miles collected outgoing mail that had been placed in a window in the common room of the housing unit in which the defendant and seven other male inmates were being detained. One item of mail, an envelope addressed to, and with the same return address of, the defendant's girl friend (the return address and sending address were that of the jail)[15] raised a "red flag." Miles confiscated the letter because, as indicated by the envelope's return address, "it was mail from a female [who obviously did not reside] in a housing unit that was male."

The jail's policy permitted an inmate's mail to be read by jail personnel only if the mail was first deemed to be contraband. Miles considered the letter contraband and opened it to identify the sender, as it appeared to have a female sender and only a male inmate in the unit would have authored it. He called out the defendant's name, but the defendant did not respond. Another inmate went to the defendant's cell and informed the defendant that his mail had been confiscated.

Miles returned to the defendant the envelope in which the letter had been contained, but Miles kept the letter itself. He then verified that the defendant's girl friend was housed at the jail, that she and the defendant were "codefendants," and that

---

[15] The envelope was addressed to "Cherily Nixon, 244 Uriah Branchway, Emporia, VA 23847," and had the return address of "Cherily Nixon, 244 Uriah Branchway, Emporia, VA 23847."

neither the defendant nor the defendant's girl friend had obtained permission to correspond. Miles read the letter[16] and then returned to the defendant's cell to retrieve the envelope. Miles also confiscated a second letter from the defendant's cell (that letter was sent to the defendant from his girl friend).[17] Miles forwarded the letters to his supervisor.

The defendant maintains on appeal that his letter to his girl friend[18] should have been suppressed because it was confiscated in violation of his right to free speech under the First Amendment. In reviewing a decision on a motion to suppress, "we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of [the judge's] ultimate findings and conclusions of law.'" Commonwealth v. Scott, 440 Mass. 642, 646 (2004), quoting Commonwealth v. Jimenez, 438 Mass. 213, 218 (2002).

Courts "must take cognizance of the valid constitutional claims of prison inmates." Turner v. Safley, 482 U.S. 78, 84

---

[16] The relevant portions of this letter appear earlier in this decision.

[17] Lieutenant Richard Miles testified that, pursuant to a policy of the Southside regional jail, the discovery of contraband authorizes a cell search.

[18] Only some of the contents of the letter that the defendant had written to his girl friend were admitted in evidence over his objection at trial. The prosecutor did not seek to admit the letter that the defendant's girl friend had written to him.

(1987).  Because prisoners retain their constitutional rights, "[w]hen a prison regulation or practice offends a fundamental constitutional guarantee, . . . courts will discharge their duty to protect constitutional rights."  Id., quoting Procunier v. Martinez, 416 U.S. 396, 405-406 (1974) (Martinez).  Regulations, policies, or practices that restrict the written correspondence or mail of prisoners no doubt implicate the First Amendment's guarantee of freedom of speech.  See, e.g., Martinez, supra at 406, 408.

At the same time, "[p]rison [officials] are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody." Martinez, 416 U.S. at 404.  "The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication."  Id.  Running a prison requires "expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government."  Id. at 405.  As such, "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform."  Id. Consequently, "[w]here a [S]tate penal system is involved . . . courts have . . . additional reason to accord deference to the

appropriate prison authorities."  Turner, 482 U.S. at 85, citing Martinez, supra.

In Martinez, 416 U.S. at 398, 416, the United States Supreme Court first addressed the issue of prisoner mail when it considered the constitutionality of a California Department of Corrections regulation that censored inmate mail deemed to magnify grievances or contain other inflammatory statements.  In determining whether "censorship of prisoner mail is justified," id. at 413, the Supreme Court set forth a two-part test:

> "First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of evidence.  Prison officials . . . must show that a regulation authorizing mail censorship furthers one or more of the substantial government interests of security, order, and rehabilitation.  Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved."

Id.

Subsequently, in Turner, 482 U.S. at 81, the Supreme Court considered a Missouri regulation that forbade communication between inmates at different institutions.  The Supreme Court took care to distinguish its earlier holding in Martinez, noting that the Martinez case "turned on the fact that the challenged regulation caused a 'consequential restriction on the First and Fourteenth Amendment rights of those who are not prisoners'" (emphasis in original).  Turner, supra at 85, quoting Martinez,

416 U.S. at 409. The Supreme Court upheld the challenged regulation and in so doing set forth a standard to be applied different from that stated in Martinez. Turner, supra at 89, 93. Recognizing that courts must balance First Amendment rights of prisoners against legitimate penological governmental interests, the Supreme Court expressly adopted a deferential standard of scrutiny for the review of regulations and policies in the prison context that infringe on free speech rights under the First Amendment.[19] Id. at 89. Specifically, the Supreme Court directs that, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Id. Under Turner, the reasonableness inquiry focuses on several factors, none of which suggests a violation of the defendant's First Amendment rights in this case.

"The first Turner factor is multifold [and involves determining] whether the governmental objective underlying the regulations at issue is legitimate and neutral, and that the regulations are rationally related to that objective." Thornburgh v. Abbott, 490 U.S. 401, 414 (1989) (Abbott). The second factor requires determining whether alternative means

---

[19] We have adopted this standard. See Massachusetts Prisoners Ass'n Political Action Comm. v. Acting Governor, 435 Mass. 811, 819 (2002), quoting Turner v. Safley, 482 U.S. 78, 89 (1987).

exist for exercising the challenged right.  Id. at 417.  The third factor considers the "impact the accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison."  Id. at 418.  Last, Turner stated that "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns. . . .  [I]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard."  Id., quoting Turner, 482 U.S. at 90-91.

As an initial matter, the defendant argues that the letter itself was not contraband because it did not contain any physical items such as drugs or weapons.  The term contraband, however, is not so narrowly construed and includes, in accordance with its ordinary meaning and usage, any item not approved for retention.  See, e.g., 103 Code Mass. Regs. 403.06 (2001) (defining contraband as "any item[s] not approved for retention by an inmate at an institution").  See also Webster's Third New International Dictionary 494 (1993) (defining "contraband" as "goods or merchandise the importation, exportation, or sometimes possession of which is forbidden").  Here, the letter was addressed to a female inmate and thus was

sent in violation of the jail's policy prohibiting inmate-to-inmate correspondence without prior approval.  The letter was a prohibited item.  Miles properly considered it contraband.

We turn now to application of the reasonableness test, commencing with an analysis of the first Turner factor.  The policy's prohibition on inmate-to-inmate correspondence in the absence of a family relationship and where approval to correspond had not been first obtained is reasonably related to legitimate penological interests.  Here, the policy was established to ensure safety and security within the prison. The policy recognizes that inmate-to-inmate correspondence has the potential to be significantly disruptive, as such correspondence may involve planned escapes, acts of violence, or other schemes in the cases of pretrial detainees, including witness intimidation or tampering with evidence before trial. See Turner, 482 U.S. at 91-92; Nasir v. Morgan, 350 F.3d 366, 372 (3d Cir. 2003).  These concerns justify implementation of the challenged policy.  See Abbott, 490 U.S. at 404-405, 415, quoting Pell v. Procunier, 417 U.S. 817, 823 (1974) (regulations authorizing warden to reject inmate's subscription publication were aimed at protecting prison security, "a purpose [Supreme] Court has said is 'central to all other corrections goals'"); Turner, supra at 81, 91 (prohibition on correspondence between inmates of different facilities is logically connected to

legitimate security concerns); Martinez, 416 U.S. at 412-413 ("the legitimate governmental interest in the order and security of penal institutions justifies the imposition of certain restraints on inmate correspondence"); Farrell v. Peters, 951 F.2d 862, 863 (7th Cir. 1992) (prison officials may exercise discretion over delivery of correspondence between inmates in different correctional facilities based on safety and security concerns).

Turning to neutrality, the Supreme Court has "found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the content of the expression." Turner, 482 U.S. at 90. Here, the prohibition on inmate-to-inmate correspondence applies to all inmate-to-inmate correspondence, without regard to the content of the correspondence. We thus conclude that the neutrality requirement is satisfied.[20] See id.

Concerning the last part of the first Turner factor, the challenged policy is rationally connected to the legitimate safety concerns enunciated above. Of significance, the policy differentiates between inmates who are family members and

---

[20] The defendant contests neutral application of the policy because his girl friend was able to send a letter to him. The defendant points to no other instances where the policy was not enforced. Under the circumstances and on this record, the fact that the defendant's girl friend was able to send a letter to the defendant appears to be an isolated occurrence in which one parcel of mail inadvertently was not discovered and confiscated.

inmates who are not. Recognizing that there may be legitimate reasons for fellow inmates who are family members to communicate, the policy focuses "a limited class of other people with whom prison officials have particular cause to be concerned," Turner, 482 U.S. at 92, namely other inmates who are not family members. Because of the legitimate safety concerns enunciated above, and the dangers inherent in inmates of the same facility being able to freely converse, the challenged policy of limiting such correspondence to family members and requiring prior approval reasonably relates to maintaining order and security in the jail. While family members who are fellow inmates also may have ulterior motives behind their communications, the risk reasonably could be considered less likely than that concerning those inmates sharing no family background and is minimized by an approval process.

As to the second Turner factor, the defendant did not have an alternative means to exercise the challenged right because the defendant and his girl friend were not family members. We note, however, that in the defendant's case, the limitation on communication at the time was to be temporary, as he was awaiting extradition to Massachusetts. The policy, as applied to him, did not effect a permanent limitation on his right to correspond with his girl friend.

Next, concerning the impact of accommodating the asserted right if the policy is invalidated, we conclude that such accommodation would likely have a significant potential negative impact on jail personnel and other inmates. Internal correspondence to nonfamily members no doubt would increase, and with no confiscation and review of the content, there would be no way of knowing if concerted criminal activity were afoot, thus compromising security. Jail officials would not be able to prevent, deter, and discover threats, escape plans, or planned acts of violence. The safety of noncorresponding inmates would be at risk.

Last, the defendant contends that, as an alternative to enforcing the policy, Miles could have just reminded him about the policy and returned the letter to him. Such action, however, would obviate the need for the policy in the first instance and, again, would fail to uncover whether in fact any type of coordinated criminal activity was occurring. We are satisfied, therefore, that the policy is not an "exaggerated response" to the problem posed by inmate-to-inmate written correspondence. See Turner, 482 U.S. at 90-91. We conclude that an inmate does not have a First Amendment right to unmonitored written correspondence with another inmate at the same detention facility and that the policy did not violate First Amendment guarantees.

We address one additional argument made by the defendant. Relying on Abbott, 490 U.S. at 411-412, in which the Supreme Court noted that outgoing mail by its very nature does not "pose a serious threat to prison order and security," or a "danger to the community inside the prison" (emphasis in original), the defendant argues that his outgoing mail should be afforded greater constitutional protection than incoming mail. No doubt, some Federal courts, relying on Martinez, 416 U.S. at 413, have applied a different standard to the outgoing mail of prisoners as opposed to their incoming mail. See, e.g., Koutnik v. Brown, 456 F.3d 777, 784 (7th Cir. 2006), cert. denied, 552 U.S. 809 (2007) (inmates' outgoing mail scrutinized under Martinez standard); Nasir, 350 F.3d at 371 (noting that many Federal courts apply Martinez standard to outgoing mail and Turner standard to incoming mail). Other Federal courts, however, have rejected such a distinction. See, e.g., Gassler v. Wood, 14 F.3d 406, 410 n.6 (8th Cir. 1994) (rejecting distinction drawn by type of mail); Brewer v. Wilkinson, 3 F.3d 816, 824 & n.10 (5th Cir. 1993), cert. denied, 510 U.S. 1123 (1994) (reasoning that Abbott suggests that Turner standard could apply to outgoing mail because in Turner, Court explained that when determining "whether the existence of other alternatives evidenced the unreasonableness of a prison regulation or practice, a court was not to employ a 'least restrictive means

test'" set forth in Martinez).  The latter approach, rejecting any distinction between outgoing and incoming mail, recognizes that outgoing mail may pose just as many dangers as incoming mail, including escape plans, illegal activities, and threats. See Smith v. Delo, 995 F.2d 827, 831 (8th Cir. 1993), cert. denied, 510 U.S. 1052 (1994).  We need not offer our own resolution of the conflict, if any exists, of what standard of review to apply to outgoing mail as opposed to incoming mail, because the mail at issue in this case was addressed to a fellow inmate, thus rendering the mail not only outgoing mail, but also incoming mail.  We point out that the Martinez decision did not address inmate-to-inmate correspondence.  We note also, for comprehensiveness, that Abbott expressly overruled Martinez to the extent that it might support the drawing of a "categorical distinction between incoming correspondence from prisoners . . . and incoming correspondence from nonprisoners."  Abbott, supra at 413-414.

For the reasons stated, we discern no error in the denial of the motion to suppress.

2.  Other errors.  a.  Jury instructions.  The defendant argues error in the absence of an instruction on involuntary manslaughter based on reckless and wanton conduct.  Because the defendant did not specifically request this instruction at trial, or object to the charge on the ground of its absence, we

review whether there was error, and if so, whether it created a substantial likelihood of a miscarriage of justice.  See Commonwealth v. Tolan, 453 Mass. 634, 648 (2009).

"An instruction on [involuntary] manslaughter is required where any view of the evidence will permit a finding of manslaughter and not murder."  Commonwealth v. Sires, 413 Mass. 292, 301 (1992).  "In deciding whether a manslaughter instruction is supported by the evidence, all reasonable inferences must be resolved in favor of the defendant." Commonwealth v. Vanderpool, 367 Mass. 743, 746 (1975).  As relevant here, "[i]nvoluntary manslaughter is an unlawful homicide unintentionally caused by an act which constitutes such a disregard of probable harmful consequences to another as to amount to wanton or reckless conduct."[21]  Id. at 747.  However, "[w]here the felony-murder rule applies, generally the defendant is not entitled to an instruction on manslaughter." Commonwealth v. Evans, 390 Mass. 144, 151 (1983).

The defendant's claim that he was entitled to an instruction on involuntary manslaughter flows in part from his contention that the shooting could have been accidental.  In

---

[21] Involuntary manslaughter may be based on one other theory, namely, an unintentional killing resulting from "a battery not amounting to a felony which the defendant knew or should have known endangered human life."  Commonwealth v. Sanna, 424 Mass. 92, 105 (1997), quoting Commonwealth v. Pierce, 419 Mass. 28, 33 (1994).

that regard, he points out that several witnesses, Harris, Cooke, and Bamber, testified that the victim's automobile moved before the gun discharged. Thus, the defendant contends, the movement of the victim's automobile could have startled him or caused his hand to jerk in such a way that the gun "went off." This assertion of an accidental shooting is nothing more than a recasting of the argument made below that correctly was rejected by the trial judge. See Evans, 390 Mass. at 151-152 ("A defendant who kills a victim in the commission or attempted commission of a robbery, while the defendant is armed with a gun, is guilty of murder by application of the felony-murder rule. . . . The fact that, according to the defendant, the gun was discharged accidently, is of no consequence").

The defendant also contends that an involuntary manslaughter instruction based on wanton or reckless conduct was warranted because there was evidence that he was not engaged in the predicate felony, namely, attempted armed robbery. Specifically, the defendant asserts that the jury could have concluded, based on an alternative view of the evidence, that the defendant did not intend to rob the victim. He points to Chase's testimony that before the shooting, he heard the defendant say, "Open the door or I'll kill you," and Bamber, who heard someone state, "Unlock the door before I shoot." This testimony, he asserts, contradicted the only evidence of an

attempted robbery, which the defendant states was Cooke's testimony that the defendant said something to the effect of, "Give me what you have." Certainly, the jury were free to reject Cooke's testimony. The defendant's argument, however, ignores other evidence of his intent to rob, namely, his letter in jail to his girl friend in which he complained that he "hated being broke," that she reminded him that he "wasn't shit and . . . didn't have shit," and that these circumstances caused him "to not think clearly and to go out and do some dumb shit." Defense counsel argued in his closing that the letter should not be construed as inculpatory, but the defendant did not testify. Nor was evidence presented to refute the reasonable inference of a financial motive for attempted robbery that the jury could have drawn from the letter's content. Thus, contrary to the defendant's contentions, no view of the evidence supported an involuntary manslaughter instruction on the theory that an attempted armed robbery had not occurred.

Assuming, however, the absence of evidence of an intent to rob the victim, the defendant does not explain how his conduct otherwise qualified as wanton or reckless. It was undisputed that whoever killed the victim had a gun because, irrespective of what any witnesses saw, the unchallenged evidence of the medical examiner established that the victim had been shot and died as a result of a gunshot wound. There was no error in the

judge not instructing, sua sponte, on involuntary manslaughter based on wanton or reckless conduct.

b. Ineffective assistance of trial counsel. The defendant argues that his trial counsel was constitutionally ineffective because she did not request a jury instruction on involuntary manslaughter based on wanton or reckless conduct. Where we have reviewed and rejected the defendant's contention that an involuntary manslaughter instruction based on wanton or reckless conduct was warranted, this claim cannot serve as the basis for a claim of ineffective assistance of trial counsel. See Commonwealth v. Silva, 455 Mass. 503, 528 (2009).

3. Relief pursuant to G. L. c. 278, § 33E. We have examined the record pursuant to our duty under G. L. c. 278, § 33E, and discern no basis on which to grant the defendant relief.

Judgments affirmed.