SUPERIOR COURT 
 
 EDWARD G. WRIGHT VS. MASSACHUSETTS DEPARTMENT OF CORRECTION and STEVEN SILVA

 
 Docket:
 1884CV03232
 
 
 Dates:
 September , 2020
 
 
 Present:
 /s/Debra A. Squires-Lee Justice of the Superior Court
 
 
 County:
 SUFFOLK, ss.
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT
 
 

             Edward G. Wright (Wright), an inmate in the custody of the Massachusetts Department of Correction (DOC), filed this civil action against the DOC and Steven Silva (Silva), the former Superintendent at Souza-Baranowski Correctional Center (SBCC). Wright alleges that a new DOC policy of seizing all of his non-privileged incoming mail, photocopying it, and delivering to Wright the photocopies violates his Constitutional rights. Wright also argues that the DOC implemented the Policy in violation of the governing regulations, 103 Code Mass. Regs. §§ 481 and 403, and that the Policy effectively constituted an amendment to those regulations in violation of the Massachusetts Administrative Procedures Act (APA). Wright seeks declaratory and injunctive relief. Before the Court are cross Motions for Summary Judgment. For the following reasons, the Defendants' Motion for Summary Judgment is DENIED; Plaintiff's Motion for Summary Judgment is ALLOWED.
BACKGROUND
            The following factual summary comes from the admissible evidence in the summary judgment record with certain details reserved for later discussion. See Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 674, 680 (2016). Because Wright is
                                                            -1-
incarcerated and appears pro se, I do not have a consolidated statement of material undisputed facts. The following, therefore, is taken from the record as a whole and, where there appear to be disputes of fact, I have so indicated.
            A. The Parties
            When he filed this Complaint for declaratory and injunctive relief, Wright was incarcerated at SBCC. He is now held in DOC custody at the Massachusetts Correctional Institution at Norfolk (MCI-Norfolk). Wright has been in prison for more than 34 years and is serving a life sentence without the possibility of parole. His incoming mail, letters and photographs from family and friends are an essential part of his life.
            Silva was the Superintendent of SBCC and is currently the Superintendent at MCI-Norfolk. The DOC, an agency of the Commonwealth, is responsible for the policies, practices and customs at correctional facilities as well as the hiring, training, instruction, discipline and control of all employees at SBCC, including Silva.
            B. Drugs in DOC Facilities
            The introduction of drugs into prisons is a major problem for the DOC. Concerned about the introduction of drugs through the United States mail, the DOC's Office of Investigative Services (OIS) obtained statistics from January 1, 2016 to June 5, 2017 about attempted drug introductions through the mail. According to OIS, eight facilities reported attempted and completed drug introductions through the mail in that period: Massachusetts Correctional Institution (MCI)-Cedar Junction reported 35 incidents; MCI-Concord reported 34 incidents; MCI-Framingham reported 28 incidents; MCI-Norfolk reported 21 incidents; MCI-Shirley reported 35 incidents; North Central Correctional Institution (NCCI) reported 7 incidents; Old Colony Correctional Center (OCCC) reported 18 incidents; and SBCC reported 130 incidents. According to a memorandum written by Patrick DePalo (DePalo), Chief of OIS, the vast majority of the inmates involved at the facilities that reported those drug incidents involving the mail
                                                            -2-
pled guilty after having been issued disciplinary reports. Wright correctly notes, however, that DePalo indicated that only 29 of the incidents involved "confirmed" drugs, including K2, a synthetic cannabinoid, and suboxone.
            According to Wright, beginning in 2014, mailroom officers at SBCC removed all stamps from the envelopes of all incoming non-privileged mail. In 2015 and through February 20, 2018, mailroom officers removed all envelope flaps as well as stamps from incoming non-privileged mail.' Wright further avers that the DOC has always had a de facto policy of inspection and that, in his 34 years in Massachusetts' DOC facilities, the DOC inspected all of his incoming mail prior to production to him. Although the DOC asserts that there are more drugs being introduced into prisons through the mail than is shown by the OIS data, it has produced no additional evidence of drug introduction through the mail other than the data discussed above,[2] and Wright avers that DOC staff introduces illicit drugs and contraband into DOC facilities.[3] Finally, according to DePalo, techniques to conceal drugs on or within paper and envelopes are constantly evolving and it has become more difficult to identify drug-related contraband through a "quick" visual inspection of incoming non-privileged mail.
            C. The DOC's Regulations Governing Inmate Mail
            In May 2017, in response to concerns about drugs in prisons and the data obtained by OIS, the DOC, consistent with the APA, promulgated changes to 103 Code
---------------------------
[1] It is unclear when Wright moved to MCI-Norfolk and whether the removal of stamps and envelope flaps was consistent across DOC facilities.
[2] The DOC provided some data referencing an increase in drug introduction via purportedly privileged mail after implementation of the policy at issue here.
[3]For its part, the DOC avers that it has taken additional measures to address the problem of drugs in prisons including: instituting a glitter ban; increasing the use of body scanners, fluoroscopes, white boards and black lights; increasing the use of canines to screen mail and visitors (which has been subject to judicial review, see Carey v. Commissioner, infra); the provision of additional training to staff; and increasing "shakedowns" in facilities.
                                                            -3-
Mass. Regs. §§ 481 et seq., Inmate Mail.[4] Included among those changes was an amendment to 103 Code Mass. Regs. § 481.12(2) as follows:
All incoming non-privileged correspondence and packages may be required to successfully pass a fluoroscope examination for contraband materials, and shall be opened and inspected before delivery to the inmate. The purpose of inspection will be to receive and receipt any funds enclosed for the inmate; to verify and record the receipt of permitted personal property; and to prevent the transmission of contraband to the inmate. If there is reason to believe contraband is being introduced through the mail based on the paper color, texture, etc., a photocopy of the original correspondence rather than the original correspondence may be forwarded to the inmate. . . . .
            (Emphasis added).
            Another subsection of that regulation, 103 Code Mass. Regs. § 481.15(1), provides that, when "any correspondence, or portion thereof, addressed to an inmate, is received at the institution, but is not delivered to the inmate for any reason set forth in 103 CMR 481.14, the inmate, and the sender when identifiable, shall be promptly notified, in writing, of . . . the reason(s) for refusing to deliver the correspondence or a portion thereof to an inmate . . . ." One of the reasons provided under 103 Code Mass. Regs. § 481.14 to withhold correspondence from an inmate is if the "correspondence contains cash, drugs, jewelry or other contraband . . . ." 103 Code Mass. Regs. § 481.14(2)(g).
            D. Adoption of the Standard Operating Procedure At Issue
            In early 2018, the DOC began a pilot program at SBCC and other facilities where inmate drug use was particularly problematic. The program involved photocopying all incoming non-privileged mail to inmates. On August 16, 2018, the DOC Commissioner formalized that program and issued a new Standard Operating Procedure (SOP). The SOP provides that, for facilities authorized by the Commissioner, "all incoming non-privileged inmate mail shall be photocopied prior to distribution to the inmate." The
---------------------------
[4] The DOC held a public hearing prior to the amendment to permit members of the public to comment on the proposed changes to the regulation governing inmate mail. See G. L. c. 30A, § 2.
                                                            -4-
SOP further provides that inmates will receive photocopies of the envelope and all authorized photographs and that non-privileged mail will be stored for three months and then shredded unless the inmate "choos[es] to have the original mail sent to a designated person at the inmate's expense." The Commissioner authorized the use of that SOP at seven medium and maximum-security prisons.[5] At those facilities, the DOC photocopies all incoming, non-privileged mail and only the photocopies are provide to inmates.
            Wright alleges that, since the implantation of the SOP, he has received copies of correspondence from friends and family on non-durable photocopy paper prone to ripping, tearing, and destruction. Thus, because original correspondence is subject to destruction unless the prisoner pays to have it sent to a designee, prisoners run the risk of losing their correspondence. According to Wright, color copies of photographs are particularly vulnerable on the relatively delicate photocopy paper. If photocopied photographs were to be torn or destroyed, and if the prisoner had not sent the photographs to a designee, the images would be lost forever. The costs to the prisoner to forward original mail is fifty-five cents per piece of mail. Since the implementation of the SOP, none of Wright's mail correspondents received written notice that their original correspondence was not delivered. At medium security and pre-release facilities, the DOC visually inspects all individual pieces of mail and photocopies only those items that appear suspicious.
---------------------------
[5] Those prisons are MCI-Cedar Junction, MCI-Concord, MCI-Norfolk, MCI-Shirley, NCCI, OCCC, and SBCC. Other than MCI-Framingham, those are the facilities the reported the introduction of drugs through the mail in the period from January 1, 2016 to June 5, 2017.
                                                            -5-
DISCUSSION
            A. Introduction
            The DOC argues that a facility wide ban on prisoner receipt of original mail is necessary at medium and maximum-security prisons because those facilities are larger and receive more mail, making a visual inspection impossible. Further, the DOC argues that, without a complete ban on the receipt of original mail at higher security prisons, drug-involved inmates would threaten and coerce other inmates to receive incoming mail on their behalf. Thus, the DOC determined that "all incoming non-privileged inmate mail at medium security and maximum security facilities [other than MCI-Framingham and the Massachusetts Treatment Center] is reasonably suspected of including drug-related contraband."
            Wright argues that the seizure of his non-privileged mail violates his rights under the First, Fourth and Fourteenth Amendments to the Unites States Constitution. He also argues that a complete ban on the receipt of original mail violates 103 Code Mass. Regs. §§ 481 et seq.. Finally, Wright argues that the implantation of the SOP violates the APA.
            After hearing and review, and for the reasons stated below, I agree that the SOP violates the regulation and that the SOP meets the definition of a regulation under the APA. Therefore, continued implementation of the SOP absent compliance with the required notice and public comment period and / or hearing violates the APA. The DOC may well be correct that a complete ban on incoming mail is necessary to prevent the introduction of drugs into higher security facilities. Nevertheless, before it can implement that policy, it must comply with the APA. Because courts should hesitate to reach Constitutional issues where "there is a readily available statutory ground that
                                                            -6-
renders such a decision unnecessary," I decline to address Wright's Constitutional arguments. Commonwealth v. Vega, 449 Mass. 227, 234 (2007).[6]
            B. Massachusetts Administrative Procedures Act
            The APA's purpose is to "establish a set of minimum standards of fair procedure below which no agency should be allowed to fall" and to create uniformity in agency proceedings. Carey v. Commissioner of Correction, 479 Mass. 367, 371 (2018), citing Curran & Sacks, The Massachusetts Administrative Procedure Act, 37 B.U. L. Rev. 70, 76-77 (1957); Reid v. Acting Commissioner of Dep't of Community Affairs, 362 Mass. 136, 144 (1972); Palmer v. Rent Control Bd. of Brookline, 7 Mass. App. Ct. 110, 115 (1979). "The APA details procedures that State agencies, including the [DOC], must follow when adopting new regulations (as defined in the statute)." Id.
            The APA defines a "regulation" as "the whole or any part of every rule, regulation, standard or other requirement of general application and future effect, including the amendment or repeal thereof, adopted by an agency to implement or interpret the law enforced or administered by it . . . ." G. L. c. 30A, § 1. "[P]rior to promulgating a regulation (as defined by the APA), a State agency must "give notice
---------------------------
[6] The DOC argues that there is no First Amendment violation because the inmate receives the content of his correspondence, that the Fourth Amendment is not implicated in connection with prisoner property, and that there is no due process violation because the inmate can have his mail forwarded to a designee. The wisdom of not deciding those issues based on a policy that was required to, but did not meet the requirements of the APA, is bolstered by the fact that, even if a validly promulgated regulation were found to violate Wright's Constitutional rights, the regulation may still be "valid if it is reasonably related to legitimate penological interests." Commonwealth  v. Jessup, 471 Mass. 121, 130-131 (2015), citing Turner v. Safley, 482 U.S. 78, 89 (1987). Further, on that question, whether the regulation is rationally related to the government objective, evidence of alternative means other "obvious, easy alternatives" to the SOP might establish that the decision to photocopy all prison mail is an "exaggerated response to prison concerns." Jessup, 471 Mass. at 130-131. Requiring the DOC to craft a regulation in compliance with the APA would, arguably, flesh out those issues.
                                                            -7-
and afford interested persons an opportunity to present data, views, or arguments." Carey, 479 Mass. at 371, citing G. L. c. 30A, § 3.[7] "The notice and comment period provides an 'opportunity for "input" and debate by the persons affected, and deliberate resolution of issues." Id., citing Massachusetts Gen. Hosp. v. Rate Setting Comm'n, 371 Mass. 705, 707 (1977). The DOC complied with the APA when it enacted 103 Code Mass. Regs., § 481. 481.12(2) in May 2017.[8]
            A properly promulgated regulation "has the force of law . . . and must be accorded all the deference due to a statute." Borden, Inc. v. Commissioner of Pub.  Health, 388 Mass. 707, 723, cert. denied sub nom. Formaldehyde Inst., Inc. v. Frechette, 464 U.S. 936 (1983); see also New England Power Generators Ass'n, Inc. v. Department  of Envtl. Prot., 480 Mass. 398, 407-408 (2018) (same); Larrabee v.  Massachusetts Comm'n Against Discrimination, 96 Mass. App. Ct. 516, 524 (2019) (same). "The interpretation of a regulation is a question of law" and courts apply the "traditional rules of statutory construction." Ivey v. Commissioner of Corr., 88 Mass. App. Ct. 18, 23-24 (2015), quoting Commonwealth v. Hourican, 85 Mass. App. Ct. 408, 410 (2014) and Young v. Patukonis, 24 Mass. App. Ct. 907, 908 (1987). "As with statutes, regulations must be interpreted as promulgated [and] [w]ords are to be accorded their ordinary meaning and approved usage . . . when the language used constitutes the principal source of
---------------------------
[7]As noted, the DOC held a public hearing prior to amending 103 Code Mass. Regs. § 481 pursuant to G. L. c. 30A, § 2 ("A public hearing is required prior to the adoption, amendment, or repeal of any regulation if: (a) violation of the regulation is punishable by fine or imprisonment; or, (b) a public hearing is required by the enabling legislation of the agency or by any other law; or, (c) a public hearing is required as a matter of constitutional right.")
[8] There is no dispute that the DOC is subject to the APA's provisions governing the adoption of regulations. G. L. c. 30A, § 1A ("The department of correction shall be subject to sections one through eight, inclusive, and shall not otherwise be subject to this chapter, notwithstanding the exclusion of said department from the definition of the word 'agency' in section one.")
                                                            -8-
insight into regulatory purpose." Ivey, 88 Mass. App. Ct. at 23-24 (internal citations and quotation marks omitted).
            Courts ordinarily give an agency deference in the interpretation of its own regulations. Carey, 479 Mass. at 369-370 ("Unless an agency's interpretation of its own regulation is 'arbitrary, unreasonable, or inconsistent with the plain terms of the rule,' such interpretation is entitled to deference.") However, the "principles of deference . . . are not principles of abdication." Duarte v. Commissioner of Revenue, 451 Mass. 399, 411 (2008), quoting Nuclear Metals, Inc. v. Low—Level Radioactive Waste Mgmt. Bd., 421 Mass. 196, 211 (1995).
            Notwithstanding the deference afforded an agency's interpretation of its own regulations, Courts "do not defer to [an Agency's] interpretation of the APA." Carey, 479 Mass. at 371. Finally, a failure to comply with the APA can be challenged via a claim for declaratory relief. G. L. c. 231A, § 2 (claim for a declaratory judgment "may be used in the superior court to enjoin and to obtain a determination of the legality of the administrative practices and procedures of any municipal, county or state agency or official"); see also Royce v. Commissioner of Corr., 390 Mass. 425, 430 (1983) (reversing dismissal of prisoner pro se complaint for declaratory relief based on Commissioner of Correction's violation of regulation); Kenney v. Commissioner of Corr., 393 Mass. 28, 31 n.6 (1984) ("[T]he legality of the administrative practices and procedures of a State agency may be determined in a declaratory judgment action . . .").
            C. Analysis
            The first issue is whether the SOP is consistent with the regulation. It is not. The regulation provides that all incoming mail may be subject to a fluoroscope examination and will be "opened and inspected before delivery to the inmate." 103 Code Mass. Regs., § 481.12(2). It then states, "If there is reason to believe contraband is being introduced through the mail based on the paper color, texture, etc., a photocopy of the original
                                                            -9-
correspondence rather than the original correspondence may be forwarded to the inmate." Id.
            The DOC interprets 103 Code Mass. Regs., § 481.12(2) to authorize the photocopying of all incoming, non-privileged mail at higher security facilities without exception. According to the DOC: "As the Department's goal in adding language permitting photocopying to 103 CMR 481.12 was to allow photocopying in instances where it suspected incoming non-privileged inmate mail was being used to further drug introduction, the Department interprets [the regulation] to permit facility-wide photocopying when it suspects any and all incoming non-privileged inmate mail is suspected to contain drug-related contraband." The problems with that argument are manifold.
            First, the DOC's interpretation contradicts the words of the regulation. The regulation discusses the possibility of photocopying mail after it provides that all mail will be inspected. It therefore permits photocopying only if, after inspection, something about the correspondence gives rise to a suspicion that the mail contains drugs. That much is clear where the sentence permitting photocopying begins with the word "if" The use of that word has meaning. Few would dispute the ordinary and common meaning of the word "if" which is: "in the event that" or "allowing that" or "on the assumption that" or "on condition that." See Merriam-Webster, https://www.merriamwebster.com/dictionary/if (last visited Sept. 21, 2020). Here, the regulation provides that non-privileged mail will be inspected and, if the color or texture of the mail gives rise to a suspicion that it contains contraband, namely, drugs, permits the mail to be photocopied before being provided to the inmate. The DOC may engage in the conduct — photocopying — only "on the condition" or "in the event" that the mail is found to be suspicious after inspection. See Cook-Littman v. Board of Selectmen, 184 A.3d 253, 263 (Conn. 2018) (the word "if" introduces a "condition or contingency that immediately follows it"). The DOC's interpretation of the regulation, that it can skip inspection and
                                                            -10-
jump to photocopying all incoming, non-privileged mail, contradicts the plain meaning of the regulation and therefore is "inconsistent with the plain terms of the rule." Carey, 479 Mass. at 369-370.
            The DOC nonetheless argues that the term "etc." permits it to infer that a piece of mail contains contraband based solely on the fact that it is a piece of mail. That argument also fails. Etcetera is ordinarily understood to refer to "unspecified additional items" and, in the context of a listing of items, items "especially of the same kind." Merriam-Webster, https://www.merriam-webster.com/dictionary/etcetera (last visited Sept. 21, 2020). Here, the term "etc." follows two items relating to the mail itself, paper color and texture. Etcetera in the regulation, therefore, reasonably refers to other similar indicia from the correspondence itself. See In re Schouler, 134 Mass. 426, 427 (1883) ("The abbreviation . . . 'et cetera,' imports other purposes of a like character to those which have been named."); Safeco Ins. Co. of Am. v. Rehabilitation Specialists, 1994 U.S. App. LEXIS 42164 at *22 (5th Cir. 1994) ("[E]tc. is not open-ended or unlimited in reach; it is limited by the specific examples in the list that it modifies."); Geer v. Birmingham, 88 F. Supp. 189, 226-227 (N.D. Iowa 1950), rev'd on other grounds 185 F.2d 82 (8th Cir. 1950) ("The abbreviation 'etc.' ordinarily refers to others of the like kind and is used to point out that other things which could be mentioned are to be understood . . . When the term is used following things particularly named it means other things of like kind.") (internal citations omitted).
            One could postulate, for example, that "etc." refers to other visual indicia or odors evident from the mail that give rise to a suspicion it contains drugs. But, it is both arbitrary and unreasonable to conclude that the term "etc." means that the DOC can photocopy all mail of any sort without inspection and whether or not the piece of mail gives rise to an individualized suspicion. See Carey, 479 Mass. at 369-370.
            Finally, the evidence presented simply does not support the DOC's assertion that all incoming mail at high security facilities is suspect. The data presented shows
                                                            -11-
that most facilities had drugs introduced via the mail less than 50 times in an 18-month period. The DOC concedes that the facilities impacted by the SOP have a large volume of mail on a daily basis. The data, therefore, does not support the conclusion that every piece of mail received at high security prisons is suspect. To the contrary, based on the data presented here, the vast majority of mail delivered to DOC facilities, even high security facilities, is not suspect.
            The DOC argues next that the regulation does not prohibit the SOP. That may well be true — but even so, the SOP amends the regulation such that it must comply with the APA. The recent SJC decision in Carey v. Commissioner, see supra, compels this outcome. In Carey, the SJC addressed a new DOC policy of subjecting prison visitors to search by drug-detecting dogs." Id. at 368. The regulation at issue required each superintendent of a DOC facility to "establish a search procedure that is effective in preventing the smuggling of articles into the visiting area of the institution." Id. at 369. The regulation further provided that "the search procedure may include as a prerequisite to admission that visitors successfully pass through a metal detector and/or scanner, and/or a personal search, and that any articles they are carrying be thoroughly searched." Id. The SIC first held that the regulation did not preclude a canine search. Id. at 370.
            However, the SIC next considered whether, "[a]part from the question whether the canine search policy is permissible under the department's current regulations . .. the [DOC] was required to follow the procedures set forth in the APA for promulgating or amending regulations." Carey, 479 Mass. at 371-372. Applying the APA's definition of regulation "broadly," the SJC concluded that the canine search policy was subject to the APA because it "substantially affected the procedures available to the public because, prior to the implementation of the policy, visitors to correctional facilities were not subject to dog sniff searches, but now they are." Carey, 479 Mass. at 371-372.
                                                            -12-
            The DOC argues here, as it did in Carey, that the SOP does not constitute a regulation because it concerns only the internal management of the DOC. "Rules or regulations that concern 'only the internal management' of an agency are those that concern the organizational structure of that agency, or those that are directed toward agency employees, instructing them on how they should perform their duties." Id. at 372. The SOP's ban on the receipt of original mail by inmates does not relate only to the DOC's structure or how its employees should perform their duties. At a minimum, it affects all persons who write to and communicate with prisoners, most of whom would have no idea their handwritten missives reach their recipient only on photocopied paper. See id. ("policy is not exempt from APA requirements as it is not one that concerns internal management alone, and, at a minimum, it substantially affects the procedures available to visitors to correctional facilities"). The SOP also affects all inmates in that it limits the type of mail inmates can receive and keep in their possession. That the DOC amended 103 Code Mass. Regs. § 481(12)(2) in 2017 in accordance with the APA is "a strong indicator" that the DOC understood that limitations on inmate mail "would be of substantial concern to those affected." Id. at 372.[9] Further, other DOC regulations provide that members of the public who send mail to inmates that is not delivered because it contains contraband are given notice. E.g., 103 Code Mass. Regs. § 481.15. Those regulations further indicate that the DOC
---------------------------
[9] I am not one bit persuaded by the argument that the SOP "has little, if any, impact on the public or inmate population" as the DOC argues. Whether or not the limitation on receipt of original mail violates Wright's Constitutional rights, including under the First Amendment, the ban on the receipt of original mail certainly impacts prisoners as well as their family and friends and members of the public that correspond with them. Indeed, in this digital age, when most communication is electronic, the receipt of a handwritten message can bring great joy on happy occasions, and deep solace on somber ones.
                                                            -13-
understands that persons who send mail to inmates have concerns about the delivery of their mail.
            As noted, the DOC may be correct that a complete ban on the receipt of original non-privileged mail in higher security prisons is required to curb the introduction of drugs into DOC facilities through the mail. The DOC may be correct that it can promulgate a regulation to that effect consistent with the United States Constitution and the Massachusetts Declaration of Rights. But the DOC may not ignore the APA and the requirement that it proceed through the appropriate procedures to promulgate such a regulation. See Carey, 479 Mass. at 373, quoting Electronic Privacy Info. Ctr. v. United  States Dep't of Homeland Sec., 653 F.3d 1, 7 (D.C. Cir. 2011) ("the purpose of the APA would be disserved if an agency with a broad statutory command . . . could avoid notice-and-comment rulemaking simply by . . . invoking its power to interpret that statute and regulation in binding the public to a strict and specific set of obligations").
ORDER
            For the foregoing reasons, Plaintiff's Motion for Summary Judgment is ALLOWED and Defendants' Motion for Summary Judgment is DENIED. Declaratory Judgment shall enter for Plaintiff on his Amended Verified Complaint as follows:
            The Court hereby DECLARES that the implementation of the Standard Operating Procedure related to 103 Code Mass. Regs., § 481 requiring the photocopying of all non-privileged inmate mail prior to distribution to the inmate at facilities as directed by the Commissioner violates 103 Code Mass. Regs., § 481.
            The Court further DECLARES that the Department of Correction was required to meet the requirements of G. L. c. 30A, the Administrative Procedures Act, when it adopted the Standard Operating Procedure related to 103 Code Mass. Regs., § 481 requiring the photocopying of all non-privileged inmate mail prior to distribution to the inmate at facilities as directed by the Commissioner.
                                                            -14-
            Judgment shall enter for purposes of appeal. The Judgment thereafter shall be stayed for 180 days to permit the DOC to take such action as it may deem appropriate, including amending 103 Code Mass. Regs, § 481 in conformance with the APA. See Carey, 479 Mass. at 373-374 (staying entry of judgment to permit DOC action).
@/s/Debra A. Squires-Lee Justice of the Superior Court
@September , 2020
                                                            -15-
xxz