COMMONWEALTH *vs.* ARNOLD EVANS.

Middlesex.  May 2, 1983. — September 16, 1983.

Present: HENNESSEY, C.J., LIACOS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Homicide. Felony-Murder Rule. Self-Defense. Practice, Criminal,*
Instructions to jury, Admissions and confessions, Capital case. *Witness,* Bias.

The defendant at a murder trial was not entitled to jury instructions on
involuntary manslaughter, despite his claim that the victim was shot
when the defendant's gun accidentally discharged during a struggle with
the victim, where there was uncontradicted evidence that the shooting
occurred during a robbery attempt, that the defendant was armed,
and there was no evidence that the defendant had ceased his participa-
tion in the armed robbery at the time of the killing. [150-152]

The defendant at a murder trial was not entitled to any instruction on
self-defense where the only evidence was that the defendant was the
initial aggressor, that he was armed with a loaded gun, and that he in-
tended to rob the victim, and where it did not appear that the defend-
ant had reasonable ground to believe that he was in serious danger.
[152-154]

The judge at a murder trial did not err in failing to instruct the jury as to
the voluntariness of a statement made by the defendant to police
where the defendant's counsel did not request such an instruction and
where there was no evidence suggesting that the statement was a prod-
uct of coercion. [154-155]

At a murder trial, the defendant was not prejudiced by the judge's failure
specifically to instruct the jury that the testimony of a witness for the
prosecution might have been influenced by bias or ulterior motive,
where defense counsel adequately brought these considerations to the
attention of the jury in cross-examination of the witness and in closing
argument. [155]

INDICTMENTS found and returned in the Superior Court
Department on February 2, 1981.

The cases were tried before *Ronan,* J.

*Mark B. Schmidt* for the defendant.

*Charles J. Hely,* Special Assistant Attorney General, for the Commonwealth.

O'CONNOR, J.   The defendant, Arnold Evans, was convicted by a jury of murder in the first degree of Edward T. Bigham, III, of armed assault with intent to rob Bigham and Marian Ryan, and assault and battery by means of a dangerous weapon on Ryan.   The judge sentenced the defendant to a term of life imprisonment on the murder conviction, to two terms of from nineteen to twenty years on the conviction of armed assault with intent to rob, and to a term of from nine to ten years on the conviction of assault and battery.   All sentences were ordered to be served concurrently.

On appeal to this court, the defendant argues error in the trial judge's failure to instruct the jury (1) on manslaughter, (2) that the Commonwealth has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, and (3) with regard to the voluntariness of the defendant's confession.   The defendant also argues that we should exercise our powers under G. L. c. 278, § 33E, and order a new trial of the first degree murder indictment.   We reject all the defendant's contentions.   Accordingly, the judgments are affirmed.

Ryan gave the following testimony.   On October 2, 1980, at approximately 1 A.M., Bigham and Ryan, both assistant district attorneys in the Northern District, were sitting in Bigham's disabled Volkswagen automobile at the side of the eastbound lane of Memorial Drive, Cambridge, near the Massachusetts Institute of Technology (M.I.T.) boathouse. A man approached the driver's side of Bigham's car, and asked for the time.   Just as Bigham began to answer, a second man yanked open Ryan's passenger side door and grabbed her upper arm with both hands.   Ryan clung to her seat as the second man tried to pull her out of the car.   Bigham yelled, "No, you sons of bitches, no."   Reaching over with his right hand, Bigham grabbed the back of Ryan's head and pushed her down.

When Ryan first turned toward Bigham, his door was shut, but as she went down, the door was opened. Ryan could see the back of Bigham's right shoulder and his back as he held her head down; she thought Bigham was going to get out of the vehicle. Ryan then heard a loud explosion which sounded as though it were right above her head and to her left. She saw a burst of light and felt something that was burning land on her face. Bigham still was at least partially in the vehicle.

Thereafter Ryan could not see or hear for a few moments. Then she observed that Bigham was no longer in the automobile. She saw a large car located behind the Volkswagen back up with its lights off, pull out rapidly onto Memorial Drive, and turn around. Ryan then saw Bigham suddenly stand in the street outside the Volkswagen. He mouthed the words, "I'm shot," and fell to the ground. Bigham bled profusely. Ryan ran to find help and ultimately had the police notified. After the police arrived, Bigham and Ryan were taken to Cambridge City Hospital where Bigham was pronounced dead at 2:03 A.M.

Henry McLendon offered the following testimony. In October, 1980, he lived with Gregory Williams and Edwin Phoenix in Dorchester. McLendon owned a Buick Electra 225 automobile, which was silver with a black top. McLendon borrowed from Phoenix a small .22 magnum pistol because McLendon was planning to commit a robbery that night. The gun was loaded when he left the apartment. McLendon went to a housing project where he met the defendant and Alvin Carter. The defendant, McLendon, and Carter left together in McLendon's car and drove around various sections of Boston looking for someone to rob. During the ride, McLendon showed the gun to the defendant and gave it to him. They stopped near the M.I.T. boathouse around 1 A.M., and they left the car "[t]o make a robbery." The defendant approached a green automobile to ask for a "light" and "to check it out." He then rejoined Carter and McLendon. The green automobile by then had driven away. They smoked some marihuana and then saw

a Volkswagen further up the road. They entered McLendon's car and drove up behind the Volkswagen.

McLendon testified that they saw a man and a woman in the Volkswagen and that they discussed a plan for a robbery. McLendon was to wait in the car and be ready to drive away. The defendant, who still had the gun, would approach from the driver's side where the man was seated. Carter would approach from the passenger side by the woman. According to the plan, the defendant and Carter were to act simultaneously and open both doors. All three knew the gun was loaded.

Carter proceeded to the woman's side of the car, opened the door, bent over and reached in near the woman. At the same time, the defendant went to the driver's side, pulled out the gun and pointed it at the man. McLendon testified that the driver's door was opened and that he saw that the man was half way out of the car.

McLendon saw the defendant step back, "make a stance" and fire. The defendant was two feet from the man when he fired. McLendon testified that the man did not touch or grab the defendant at all. After the defendant shot the man, Carter ran back to McLendon's car but the defendant returned slowly. After the man fell to his knees, the defendant, Carter, and McLendon drove back to Boston.

In the car, the defendant said, "I think he's dead" and "[h]e thought he was going to be a tough guy and he got what he had coming." McLendon testified that the defendant was bragging about the shooting at this time and did not care about it. McLendon and the defendant dropped Carter off on Camden Street in Boston, and then went to the Fenway area where they committed another robbery. McLendon then drove the defendant home, took the gun from him, and brought it back to his apartment. At McLendon's apartment, McLendon, Phoenix, Williams, and George Pettway took the gun apart. Pettway and Williams then took the pieces and threw them away in different areas. The next day, McLendon spoke with the defendant and asked him why he was bragging about the shooting.

The defendant answered that he did not care and said, "He thought he was a tough guy and I shot him."

George Finney testified that he and the defendant "knew each other from seeing each other out on the street." In March, 1981, they met in the Suffolk County Courthouse. They talked about various things and then the defendant told Finney about shooting the assistant district attorney. The defendant said that he approached the Volkswagen, knocked on the man's window and asked him for a light. The man told him to get lost. The defendant then pulled out a gun and asked the man to give up his money. Finney testified that the defendant told him that "[t]he guy refused and he shot the guy" in the chest area. Finney asked the defendant why he had to shoot the man. The defendant said that his ankle was badly bruised or swollen, and that he could not have struggled with the man.

Thomas W. White, a Metropolitan District Commission detective, testified that on January 30, 1981, he and another detective met with McLendon and transported him to the office of the district attorney. The prosecutor promised McLendon that if he cooperated in this case, he would be allowed to plead guilty to manslaughter and the prosecutor would recommend leniency to the court.

Maryland State police Trooper Robert Lankford testified that the defendant was arrested on February 2, 1981, in Maryland, by Lankford and his partner Corporal McGee. The officers found him hiding under a bed in a friend's house near Marion, Maryland. The defendant was taken to a State police station in Princess Anne, Maryland. He was read his Miranda rights in the cruiser and he appeared to understand them. The defendant was again advised of his rights at the station and he signed a form waiving those rights. He then gave Lankford a statement which was tape-recorded. The tape recording was played to the jury.

In the statement, the defendant acknowledged that he had been advised of his constitutional rights and understood them, and that he was giving the statement voluntarily without promises or threats. He also said that earlier on

the night of the shooting, a police officer had chased some people for selling marihuana and cocaine. The officer had checked the defendant and when he found nothing on him, the officer punched him in the groin and kicked his ankles. After this incident, the defendant went back to his own house, and lost some money gambling. The defendant was with Alvin Carter and Randy, whose last name he did not know.

Around 1 A.M. or 2 A.M., according to the statement, the defendant, Carter, and Randy drove to Cambridge in Randy's Buick automobile. The defendant had a .22 magnum derringer with him which Randy had brought. In Cambridge, the defendant and the others saw a beige Volkswagen automobile and decided to rob its occupants. The defendant went to the driver's side and Carter went to the passenger side of the car. The defendant said that he had the gun in his hand and he pointed it right at Bigham's face. With the gun pointed at Bigham's face, the defendant demanded Bigham's wallet.

The statement revealed that Carter had grabbed the woman passenger and that Bigham had grabbed her back and pushed her head down to the front of the car. Bigham then grabbed the defendant's hand, kicked open the door, grabbed the defendant's throat, and was struggling with the defendant as he tried to get out of the car. The defendant's statement said that he was struggling with Bigham and that Bigham hit the defendant's hand that held the gun. The defendant had his finger on the trigger and he said that when Bigham hit his hand, the gun "just went off in his chest."

In his statement, the defendant said that "[a]fter I shot him, he didn't seem like he got shot or nothing." The defendant backed up and Bigham was still trying to get him. Bigham then grabbed his own chest, told the woman that he thought he had been shot, and fell to the ground. Carter had run back to the car. The defendant returned to the car and all three returned to Boston. Randy took the gun away from the defendant and drove the defendant home. The defendant said that Carter intended to take the woman's

pocketbook. He also said that "I was . . . just [going] to ask [the victim] to give me his wallet like I did but he resisted. He was fighting it."

The defendant heard on the radio later that morning that the victim had died. According to the statement, the defendant told his younger brother that "I shot that guy. I shot that guy on accident. The gun just went off and I don't know what to do." A couple of his brother's friends may have overheard him.

Lankford testified that when the defendant was apprehended he was frightened and began to cry but then calmed down. The defendant did not solicit any promises and was cooperative. Lankford further stated that the defendant was given his rights and clearly understood them and that the defendant was offered something to eat while he was at the State police office.

This evidence was all presented by the Commonwealth. The defendant rested at the close of the Commonwealth's case.

1. The defendant first argues that the judge erred in refusing to instruct the jury on the issue of involuntary manslaughter. "Involuntary manslaughter is an unlawful homicide unintentionally caused by an act which constitutes such a disregard of probable harmful consequences to another as to amount to wanton or reckless conduct." *Commonwealth* v. *Vanderpool*, 367 Mass. 743, 747 (1975). The defendant submits that his confession was evidence that he did not intend the shooting and that the homicide occurred accidently during a struggle between the defendant and the victim. Thus, he concludes the jury should have been given an instruction on involuntary manslaughter. We disagree.

Examining the evidence in the light most favorable to the defendant, we conclude that no instruction on involuntary manslaughter was warranted in the circumstances of this case. Uncontradicted evidence reveals that the defendant and Carter approached the Volkswagen with the intent of robbing the victim and Ryan. The defendant admitted that he held a loaded gun which he pointed in the victim's face,

while he asked for the victim's wallet. When Carter grabbed Ryan, the victim pulled her back and pushed her head down toward the front of the car. According to the defendant's recorded statement, the victim then grabbed the defendant's hand and struggled with him. During this struggle, the victim hit the defendant's arm while the defendant's finger was on the trigger and the gun fired into the victim's chest.

A defendant who kills a victim in the commission or attempted commission of a robbery, while the defendant is armed with a gun, is guilty of murder by application of the felony-murder rule. *Commonwealth* v. *Watson*, 388 Mass. 536, 544 (1983). Conscious disregard of the risk to human life need not be further shown. See *Commonwealth* v. *Moran*, 387 Mass. 644, 650-651 (1982); *Commonwealth* v. *Matchett*, 386 Mass. 492, 506-508 (1982). Where the felony-murder rule applies, generally the defendant is not entitled to an instruction on manslaughter. *Commonwealth* v. *LePage*, 352 Mass. 403, 419 (1967) ("There was [no necessity for a manslaughter charge] for there was no evidence upon which the jury could find that the [defendant was] not engaged in the commission of a felony when the killing occurred"). *Commonwealth* v. *Lussier*, 333 Mass. 83, 92-93 (1955). *Commonwealth* v. *Green*, 302 Mass. 547, 556 (1939). *Commonwealth* v. *Devereaux*, 256 Mass. 387, 393-394 (1926).

The defendant contends that the jury might have found that at the time of the killing the defendant was no longer engaged in an armed robbery and that the defendant accidently killed Bigham in circumstances not calling for application of the felony-murder rule. This argument is without merit. There is no evidence that the defendant had ceased his participation in the armed robbery at the time of the killing. See *Commonwealth* v. *LePage, supra* at 419-420. Furthermore, there is no evidence that the victim's resistance was of such an unreasonable nature as to permit a conclusion that the resulting struggle and allegedly accidental firing of the gun was not a natural and probable consequence

of the armed robbery. See *Commonwealth* v. *Devlin*, 335 Mass. 555, 567 (1957). Cf. *Commonwealth* v. *Devereaux*, *supra* at 393 ("It has been decided that one is justified in using any degree of force against a robber holding him up with a pistol . . ."). The fact that, according to the defendant, the gun was discharged accidently is of no consequence. See *Commonwealth* v. *Lussier*, *supra* at 87, 92-93 (no manslaughter charge required where felony-murder rule involved even though defendant claimed that "his pistol was fired by accident . . . when [he] slipped on the ice").

Finally, our reasoning in *Commonwealth* v. *Campbell*, 352 Mass. 387, 392-399 (1967), relied on by the defendant, is inapposite. In *Campbell*, we held that it was reversible error to refuse to charge the jury on the subject of manslaughter where one of the defendants denied that he intended to commit the underlying felony and denied that he intended to murder the victim. *Id.* at 394, 397-398. We noted that "the jury's verdicts of murder in the first degree could have been based only on the finding that the defendant Campbell strangled the deceased during an assault with intent to commit rape." *Id.* at 393. The defendant testified, however, that he had not intended either to rape or to kill her, but rather that he had placed his arm around the victim's throat and held her for several moments solely to quiet her down. *Id.* at 393-394, 397. We noted that the defendant's testimony, if believed, would constitute an assault and battery which was classified as a misdemeanor and not a felony. *Id.* at 397. We concluded that since "[m]anslaughter is simply a battery that causes death," a charge on manslaughter should have been given. *Id.* In this case, however, evidence that the killing did not take place in the course of an inherently dangerous felony was lacking. Thus, in the circumstances of this case, the judge did not err in refusing to instruct the jury on manslaughter. .

2. We also reject the defendant's argument that the judge committed reversible error in failing to instruct the jury as to the Commonwealth's burden of proof on the issue

of self-defense.[1]  The judge charged the jury that every person has a right of self-defense whenever reasonably necessary to thwart a person from inflicting bodily harm and that the concept of self-defense "applies equally" to the defendant and the victim.  The defendant urges that this charge was erroneous because it did not impress upon the jury that the Commonwealth must prove beyond a reasonable doubt that the defendant did not act in self-defense.  See *Commonwealth* v. *Stokes*, 374 Mass. 583, 591-593 (1978).  See also *Mullaney* v. *Wilbur*, 421 U.S. 684 (1975).

The judge's failure to instruct the jury on the Commonwealth's burden of proof on the issue of self-defense was not erroneous because the defendant was not entitled to any instruction on self-defense.  The only evidence was that the defendant was the initial aggressor, that he was armed with a loaded gun, and that he intended to rob the victim.  In *Commonwealth* v. *Maguire*, 375 Mass. 768, 772 (1978), we observed that many courts have held "that the right of self-defense ordinarily cannot be claimed by a person who provokes or initiates an assault unless that person withdraws in good faith from the conflict and announces his intention to retire."  In *Commonwealth* v. *Johnson*, 379 Mass. 177, 180-181 (1979), we concluded that "[b]ecause the jury's verdicts necessarily characterize the defendant as the robber, the privilege of self-defense was not applicable since there was no evidence that he withdrew in good faith and announced his intention to retire from the conflict."  A right of self-defense was not available in this case because there is no evidence that the defendant withdrew from the conflict. We note that the victim's apparently unarmed struggle with the defendant could not be said to constitute the use of excessive force.  Thus, we need not consider whether the use

---

[1] We note that trial counsel did not object to the instruction that was given.  Notwithstanding the absence of an objection, we review the defendant's claim under G. L. c. 278, § 33E, to determine if there is a "substantial likelihood that a miscarriage of justice has occurred." *Commonwealth* v. *Tavares*, 385 Mass. 140, 149 (1982), quoting *Commonwealth* v. *Garcia*, 379 Mass. 422, 439 (1980).

of excessive force by the victim would have provided the defendant with a right of self-defense. Cf. *Commonwealth* v. *Maguire, supra* at 773 ("[I]t has been held that the right to claim self-defense may be forfeited by one who commits an armed robbery, even if excessive force is used by the intended victim").

We note that a right of self-defense was unavailable in this case on the additional ground that it does not appear that the defendant "had reasonable ground to believe and actually did believe that he was in imminent danger of death or serious bodily harm, from which he could save himself only by using deadly force." *Commonwealth* v. *Walden,* 380 Mass. 724, 729 (1980), quoting *Commonwealth* v. *Harrington,* 379 Mass. 446, 450 (1980).[2] Accordingly, the defendant was not entitled to any instruction on the issue of self-defense.

3. The defendant next argues that the judge erred in failing to instruct the jury as to the voluntariness of his confession. A jury instruction on the voluntariness of a defendant's statements to the police is required, however, only where "it is made a live issue at trial." *Commonwealth* v. *Alicea,* 376 Mass. 506, 523 (1978). *Commonwealth* v. *Tavares,* 385 Mass. 140, 150 (1982). In this case, trial counsel did not request an instruction on voluntariness. See *Commonwealth*

---

[2] The defendant does not distinguish between a privilege of self-defense, which, if shown, exonerates a defendant, and a showing of either (1) reasonable provocation or (2) the use of excessive force in self-defense, which, if shown, would entitle a defendant to a voluntary manslaughter charge. See *Commonwealth* v. *Walden,* 380 Mass. 724, 729 n.3 (1980); *Commonwealth* v. *Harrington,* 379 Mass. 446, 450 (1980). A privilege of self-defense arises only where a defendant "(1) had reasonable ground to believe and actually did believe that he was in imminent danger of death or serious bodily harm, from which he could save himself only by using deadly force, (2) had availed himself of all proper means to avoid physical combat before resorting to the use of deadly force, and (3) used no more force than was reasonably necessary in all the circumstances of the case." *Id.* We indicated in *Harrington* that an instruction on manslaughter may be warranted where the latter two elements are absent on a theory of either reasonable provocation or the use of excessive force in self-defense. *Id.* In this case we conclude that not even the first element is demonstrated.

v. *Tyree*, 387 Mass. 191, 212 (1982), cert. denied, 459 U.S. 1175 (1983). Furthermore, there is no evidence suggesting that the statement was a product of coercion. Accordingly, the judge's failure to charge the jury on this issue was not error.

4. Finally, the defendant argues that we should exercise our powers under G. L. c. 278, § 33E, and order a new trial. He asserts that several alleged errors require that the verdict of murder in the first degree be set aside. First, he suggests that, because the jury could have found that the shooting was an accident, he was entitled to an instruction as to "whether the shooting was incidental to and a natural and probable consequence of the attempted robbery, or was independent of such attempt." *Commonwealth* v. *Lussier*, 333 Mass. 83, 91 (1955). As we have indicated, *supra*, there is no evidence in this case that the defendant had terminated his participation in the attempted robbery at the time of the shooting. See *LeBlanc* v. *Commonwealth*, 363 Mass. 171, 176 (1973); *Commonwealth* v. *Leavey*, 359 Mass. 744, 745 (1971). That the shooting may have been an accident does not relieve the application of the felony-murder rule. See *Commonwealth* v. *Lussier, supra.*

The defendant next argues that the judge erred in not specifically instructing the jury about the possibility that McLendon's testimony was influenced by bias or ulterior motive. Trial counsel, however, did not request such an instruction. Furthermore, trial counsel adequately brought these considerations to the attention of the jury in cross-examination of McLendon and in closing argument. In addition, immediately after McLendon's testimony, the judge instructed the jury on the relevance of rewards, promises, or other arrangements with regard to the issue of credibility. In these circumstances, the absence of a further specific instruction was not erroneous.

The defendant's argument that the judge in his charge unfairly overemphasized the importance of the case to the Commonwealth and during the trial alluded to the existence of an appellate process that would correct errors of law made by him is without merit.

We reject the defendant's claims of error. Furthermore, we have reviewed the record as we are required to do under G. L. c. 278, § 33E, and we conclude that the interests of justice require neither a new trial nor the entry of a verdict of a lesser degree of guilt on the murder conviction than that found by the jury.

*Judgments affirmed.*