NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11173

COMMONWEALTH  vs.  ADILSON F. NEVES.


Plymouth.     October 9, 2015. - May 25, 2016.

Present:  Gants, C.J., Spina, Botsford, Lenk, & Hines, JJ.


Homicide.  Felony-Murder Rule.  Constitutional Law, Admissions
    and confessions, Waiver of constitutional rights,
    Voluntariness of statement.  Evidence, Admissions and
    confessions, Voluntariness of statement, Testimony before
    grand jury.  Grand Jury.  Practice, Criminal, Capital case,
    Admissions and confessions, Waiver, Voluntariness of
    statement, Grand jury proceedings, Transcript of testimony
    before grand jury, Sequestration of witnesses, Striking of
    testimony, Request for jury instructions.



    Indictment found and returned in the Superior Court
Department on May 15, 2008.

    A pretrial motion to suppress evidence was heard by
Christine M. Roach, J., and the case was tried before Jeffrey A.
Locke, J.


    Jeffrey L. Baler for the defendant.
    Gail M. McKenna, Assistant District Attorney (Audrey
Anderson, Assistant District Attorney, with her) for the
Commonwealth.

LENK, J.  The defendant was convicted by a Superior Court jury of murder in the first degree on a theory of felony-murder in the 2008 shooting death of Edward Conley, a Brockton taxicab driver.  Before us is the defendant's appeal from his conviction.  The defendant asserts error in four respects: (1) the failure to suppress statements later admitted in evidence that were made involuntarily to police, in violation of his Miranda rights, see Miranda v. Arizona, 384 U.S. 436, 444-445 (1966) (Miranda); (2) the introduction over objection of a witness's grand jury testimony after the witness claimed a loss of memory; (3) the failure to strike, upon request, another witness's testimony after learning that he had violated a sequestration order; and (4) the failure to give a requested instruction on involuntary manslaughter.  The defendant also seeks relief under G. L. c. 278, § 33E.  While we conclude that some of the defendant's statements to police were not made voluntarily and should not have been admitted, any error was harmless beyond a reasonable doubt.  We also conclude that the judge's rulings with respect to the contested witness testimony and the instruction on involuntary manslaughter were not in error.  Having reviewed the entire record, we affirm the conviction and discern no reason to exercise our authority to grant extraordinary relief.

1.  Factual background.  We recite the facts the jury could have found, reserving certain details for later discussion.  In early February, 2008, the defendant discussed plans to rob a drug dealer with Jeffrey Milton, Antonio Fernandes, and Brandon Walters.  On February 15, 2008, however, the drug dealer whom the defendant had in mind was not available.  The defendant proposed to the group that they instead rob a taxicab driver.  The defendant showed them that he had a gun.

Shortly after midnight, the defendant drove Milton in the defendant's automobile, a green Honda, to a pay telephone.  Using a female-sounding voice, Milton telephoned for a taxicab to come to a specific address on Galen Street in Brockton.  The defendant previously had identified that address as being "perfect" for robbing a taxicab driver:  it was at the end of a dead end street, and the nearby street lighting was dim.

The defendant and Milton then picked up Fernandes and Walters, and drove to the end of another street that was close to Galen Street.  While Milton and Walters waited with the defendant's Honda, the defendant and Fernandes went to meet the taxicab, which was not visible from where the Honda was parked.  When the taxicab arrived, the defendant telephoned Walters to tell him to start the Honda's engine.  The defendant got into the back seat of the taxicab, behind the driver, Conley.  Fernandes also got into the back seat, but on the passenger's

side. The defendant then took out the gun and pointed it at Conley, and Fernandes told Conley to give them his money.

Conley panicked and grabbed for the gun. Although the progression of the subsequent events is disputed, it is clear that, at some point, the gun discharged, and Conley was shot in the back of the head behind the right ear at close range. It is also clear that the taxicab accelerated away from the end of Galen Street and crashed into a fence near a house farther up the street.

The defendant and Fernandes jumped out of the vehicle while it was still in motion and ran back to the Honda. Fernandes reached the Honda first, followed closely thereafter by the defendant, who was injured and missing a shoe. The defendant said that he had lost his cellular telephone. He then handed something wrapped in a sweatshirt to Walters, and Walters put it in the trunk. They drove away.

In the early morning hours of February 16, 2008, the defendant woke up Nicole Resendes, his then girl friend. He told her that his cellular telephone and shoes had been stolen from him in a robbery. He later asked his associate Joao Cruz

explicitly to be his "alibi" for the time of the shooting, relating to him a story similar to the one he had told Resendes.[1]

Soon after the shooting, police found Conley slumped over the steering wheel and unresponsive. Conley was taken to a local hospital, where he was pronounced dead between 1 and 2 $\underline{A}$.$\underline{M}$. Police did not find any identifiable fingerprints at the scene, but did find a shoe on the street approximately fifty yards from the crash that had Conley's blood on it.[2] After a tip from a suspect in an unrelated crime, the investigation eventually turned to the defendant. Police questioned the defendant at the Brockton police station on March 14, 2008, and again after his arrest on March 24, 2008. During the second interview, the defendant stated that he shot Conley. Each interview was audio-video recorded.

2. Procedural background. On May 15, 2008, a grand jury returned an indictment charging the defendant with murder in the first degree, G. L. c. 265, § 1. Before trial, the defendant

---

[1] Joao Cruz was granted immunity in exchange for his testimony, and the jury were so instructed.

[2] The deoxyribonucleic acid (DNA) profile of Edward Conley matched a DNA sample obtained from swabs of human blood spatter found on the left lace area and left heel area of the shoe. The probability of a randomly selected unrelated individual having the DNA profile matching that obtained from each of these areas was one in 4.895 quadrillion of the Caucasian population, one in 5.255 quintillion of the African-American population, and one in 8.41 quadrillion of the Hispanic population.

moved to suppress the statements he made during both police interviews. After an evidentiary hearing on October 21, 2010, a Superior Court judge denied the motion. At trial, the jury were shown slightly redacted versions of the interviews.

The defendant did not testify. His theory of defense was that his recorded statements had not been made voluntarily, that the Commonwealth's witnesses at trial were not credible, and that Conley's death occurred accidentally after the armed robbery had ended.

After the close of all the evidence, the jury were instructed on murder in the first degree on theories of premeditation, extreme atrocity or cruelty, and felony-murder by armed robbery or attempted armed robbery.[3] On April 15, 2011, the defendant was convicted of murder in the first degree on a theory of felony-murder.[4] The defendant, who was seventeen years old at the time of the shooting, was sentenced to the then-mandatory term of life in prison without the possibility of

---

[3] The defendant was not separately indicted for armed robbery.

[4] Antonio Fernandes, who was sixteen at the time of the shooting, was tried separately. He pleaded guilty to manslaughter and was sentenced to a term of incarceration of from ten to twelve years in State prison. The record does not make clear how Jeffery Milton's case was resolved, but he testified pursuant to a plea agreement. On cross-examination, he stated that he expected to receive a sentence of from eight to ten years in exchange for his testimony. Brandon Walters was not charged.

parole.[5]  This appeal followed.

3.  Discussion.  The defendant claims reversible error in four respects.  First, he argues that it was error to deny his motion to suppress statements he made to police, because the waiver of his Miranda rights was not valid and because his statements were not made voluntarily.  Second, he argues that it was error to permit the introduction of grand jury testimony from a witness (Resendes) who claimed memory loss during her trial testimony.  Third, he argues that it was an abuse of discretion not to strike a witness's testimony after the witness (Milton) violated a sequestration order.  Fourth, he argues that it was error for the judge not to give an instruction on involuntary manslaughter.  Each of the claimed errors was preserved.  Finally, the defendant asks that we grant a new trial or reduce the verdict to a lesser degree of guilt pursuant to our power under G. L. c. 278, § 33E.

For the reasons that follow, we affirm the defendant's conviction and decline his request that we grant him extraordinary relief pursuant to G. L. c. 278, § 33E.

a.  Motion to suppress.  The defendant argues that it was error to deny his motion to suppress statements made to Brockton

---

[5] See Diatchenko v. District Attorney for the Suffolk Dist., 466 Mass. 655, 658-659, 674 (2013), S.C., 471 Mass. 12 (2015) (requiring meaningful possibility of parole for juveniles convicted of murder in first degree).

police officers during two interviews on March 14, 2008, and March 24, 2008. During the first interview, the defendant admitted that the shoe found on Galen Street was his, but denied any involvement in the events leading up to Conley's death. During the second interview, however, the defendant admitted, among other things, to holding the gun when Conley was shot.

Statements of a defendant subject to custodial interrogation must be suppressed if the Commonwealth cannot prove beyond a reasonable doubt both that the defendant validly waived his Miranda rights, see Miranda, 384 U.S. at 444-445, and that he made the statements voluntarily.[6] See Commonwealth v. Pucillo, 427 Mass. 108, 110 (1998). The defendant contends that he did neither. He also contends that he explicitly invoked his or her right to silence in the middle of the second interview, and that the police failed scrupulously to honor that request.

In reviewing a ruling on a motion to suppress, we "accept the judge's subsidiary findings of fact absent clear error, but conduct an independent review of the judge's ultimate findings and conclusions of law." Commonwealth v. Washington, 449 Mass. 476, 480 (2007), citing Commonwealth v. Scott, 440 Mass. 642,

---

[6] Although the defendant was not under arrest at the time of the first interview, we assume arguendo that the circumstances of the interview established a custodial situation requiring that the defendant be informed of his Miranda rights. See Commonwealth v. Groome, 435 Mass. 201, 211-212 (2001).

646 (2004). "The determination of the weight and credibility of the testimony is the function and responsibility of the judge who saw and heard the witnesses, and not of this court." Commonwealth v. Moon, 380 Mass. 751, 756 (1980). Where a decision is based on recorded rather than live testimony, however, "we will 'take an independent view' of recorded confessions and make judgments with respect to their contents without deference to the fact finder, who 'is in no better position to evaluate the[ir] content and significance.'" Commonwealth v. Novo, 442 Mass. 262, 266 (2004), quoting Commonwealth v. Bean, 435 Mass. 708, 714 n.15 (2002).

The motion judge concluded that the defendant validly waived his Miranda rights, and that his statements during both interviews were voluntary. Her conclusions were based on her analysis of the recorded interviews and her assessment of live testimony from two clinicians (one testifying for the Commonwealth and one for the defendant) concerning the effect of childhood lead poisoning on the defendant's ability to understand his rights.[7] The judge gave little weight to the testimony of either expert.

---

[7] The motion judge also heard testimony from one of the police officers who interviewed the defendant; she did not address that testimony explicitly in her analysis.

For reasons we explain, we agree with the determination of the motion judge that the defendant validly waived his Miranda rights at both interviews. We further agree that the defendant made voluntary statements at the first interview, and initially made voluntary statements at the second interview. Thereafter, however, the police failed to honor scrupulously the defendant's repeated requests to end questioning. The statements he made subsequent to those requests therefore should have been suppressed. Nonetheless, given the other properly admitted evidence, their admission was harmless beyond a reasonable doubt.

i. Miranda waivers. "A valid Miranda waiver is one that is made knowingly, intelligently, and in all respects, voluntarily." Commonwealth v. Selby, 420 Mass. 656, 660 (1995), S.C., 426 Mass. 168 (1997). In determining the validity of a waiver, relevant considerations include the totality of the circumstances, such as "promises or other inducements, conduct of the defendant, the defendant's age, education, intelligence and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of the discussion of a deal or leniency (whether the defendant or the police), and the details of the interrogation, including the recitation of Miranda warnings." Id., quoting Commonwealth v. Mandile, 397 Mass. 410, 413 (1986).

The defendant argues that he did not validly waive his Miranda rights at either interview because he was seventeen years old at the time of the interviews, and because his exposure to lead paint as a child limited his ability to understand his rights before waiving them. In light of the totality of the circumstances, however, we conclude that the Miranda waivers were valid.

Deferring to the motion judge's assessment, we afford little weight to expert testimony concerning the defendant's ability to comprehend and validly waive his Miranda rights. According to the defendant's expert, a forensic psychologist, the defendant's "performance in tests of attention and concentration were atrociously poor." Yet the motion judge specifically described as "dubious" the psychologist's contention that the defendant's intelligence quotient had dropped from ninety-six in 2006 to seventy-five in 2009 (following his arrest in this case), putting him in the fifth percentile for his age group.[8] On the other hand, the Commonwealth's expert, a physician specializing in childhood lead poisoning, asserted that he had never encountered a patient with the defendant's level of intelligence and creativity who could not understand "simple instructions" like Miranda rights.

---

[8] In 2006, the expert had measured the defendant's intelligence quotient as part of an unrelated civil case.

We discern no error in the motion judge's assessment of this conflicting testimony.

It is evident from the video recordings that, at the beginning of each interview, the police read the defendant the Miranda rights and showed him a paper copy of those rights.[9] Both times, the defendant stated that he understood his rights, and signed a waiver form. The recorded interviews do not indicate that the police induced the defendant to waive his rights in any way. He appeared confident and composed during each interview, and specifically confirmed at the beginning of the first interview that he was not under the influence of drugs or alcohol. Although the defendant was only seventeen at the time of the interviews, he had prior experience with the Miranda warnings. The totality of the circumstances indicates that the defendant validly waived his Miranda rights at each interview.

ii. Voluntariness of statements. Whether a defendant has validly waived his rights is a separate question from whether his or her subsequent statements were voluntary, but one that similarly "require[s] us to examine the totality of the circumstances surrounding the making of the statements to ensure that the defendant's will was not overborne." Commonwealth v.

---

[9] Police also read the defendant his Miranda rights while he was being transported to the Brockton police station for the second interview.

Hoose, 467 Mass. 395, 403 (2014). Statements made after a valid waiver are considered voluntary if they are the product of a "rational intellect" and a "free will" (citation omitted). Commonwealth v. Davis, 403 Mass. 575, 581 (1988), S.C., 410 Mass. 680 (1991).

The defendant argues that his free will at both interviews was overborne by the aggressive tactics the police employed during the first interview, tactics so coercive that they also rendered involuntary his statements at the second interview. We do not agree. While "we expressly disapprove of the tactics of making deliberate and intentionally false statements to suspects in an effort to obtain a statement," Commonwealth v. DiGiambattista, 442 Mass. 423, 432 (2004), quoting Commonwealth v. Jackson, 377 Mass. 319, 328 n.8 (1979), the use of such aggressive interrogation techniques is just one factor to be considered in analyzing the totality of the circumstances. See Commonwealth v. Baye, 462 Mass. 246, 256 (2012) (Baye), citing Commonwealth v. Tremblay, 460 Mass. 199, 210-211 (2011).

During the first interview, police questioning intensified as it became clear that the defendant was unwilling to admit to having been involved in the shooting. Police told him that they were in possession of his cellular telephone and cellular site

location information, although they were not;[10] that they had "terrific" surveillance video footage of his Honda near the location of the shooting, although they did not; and that his fingerprint had been found on the taxicab, although that was not the case. In addition, police encouraged the defendant to "come clean" in order to protect his girl friend and to prevent his eleven year old brother from thinking that he was a "monster."

These tactics did not, however, overbear the defendant's will. In Baye, supra at 257-258, we concluded that a defendant's statements should have been suppressed where considerably more aggressive police interrogation over the course of ten hours induced the defendant to admit that he had committed the crime being investigated. The defendant here, on the other hand, was unshaken by the officers' questioning over the course of the first interview, which lasted approximately two and one-half hours. Despite the officers' misrepresentations, the defendant had strong reason to suspect that the police knew less about the shooting than they claimed,[11]

---

[10] Police never found the defendant's cellular telephone.

[11] For example, the officers claimed that they had found the defendant's fingerprint on the exterior of the taxicab, but the defendant was wearing gloves at the time of the shooting. They also claimed to know that Nicole Resendes, the defendant's girl friend at the time, had telephoned for the taxicab. Yet the defendant knew that Milton, not Resendes, called the taxicab company, because he had been with him when the call was made.

and repeatedly told them that he did not believe them. Throughout that interview, he adhered to a more detailed version of the alibi that he previously had related to Resendes and Cruz. He explained that on the night in question his shoes and cellular telephone, among other items, were stolen from him at gunpoint at a location on the opposite side of Brockton from where Conley was found. These factors, along with the factors examined in more detail in our discussion of the defendant's valid Miranda waivers, supra, lead us to conclude that the defendant's statements at the first interview were voluntary.

The defendant's statements at the second interview also initially were voluntary. From the start of the interview, when the defendant knew he was in custody and had been charged with murder, he was forthcoming about his involvement in the events leading up to Conley's death.[12] Although police informed the defendant that he had "one shot" to talk, they did not employ the other aggressive tactics that they had used during the first interview. Furthermore, the police tactics used during the

---

[12] Immediately after waiving his Miranda rights, the defendant stated that he "didn't even pull the trigger down." He explained that he and Fernandes had been planning to rob a drug dealer and had called a taxicab to go to the drug dealer's house, but that, en route, Fernandes unexpectedly pulled out a gun. At that point, the defendant said, he jumped out of the vehicle and ran away; he maintained that he was not in the vehicle at the time of the shooting. He later recanted this version of events, and stated instead that he had been holding the gun when Conley was shot.

first interview were not so coercive as to have rendered involuntary the statements that the defendant made ten days later. Moreover, the defendant attempted a number of times to invoke his right to remain silent partway through the interview.

iii. _Subsequent invocation of right to silence_. Even if a defendant initially waives the right to remain silent, he or she may invoke that right at any point during questioning. Commonwealth v. Clarke, 461 Mass. 336, 343 (2012) (Clarke), citing Commonwealth v. Bradshaw, 385 Mass. 244, 265 (1982). A subsequent invocation "must be clear and unambiguous[], such that 'a reasonable police officer in the circumstances would understand the statement to be an invocation of the Miranda right.'" See Commonwealth v. Smith, 473 Mass. 798, 808 (2016) (Smith), quoting Commonwealth v. Howard, 469 Mass. 721, 731 (2014). A postwaiver invocation must be "scrupulously honor[ed]" by the police. See Smith, supra at , quoting Miranda, supra at 479. Although police may seek to clarify a defendant's ambiguous expression of an intent to stop questioning, they may not "ignore[] the long-standing principle that 'postrequest responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself'" (citations omitted). Commonwealth v. Santos, 463 Mass. 273, 287 (2012) (Santos).

Beginning approximately one hour into the second interview, the defendant requested multiple times that the police stop questioning him. He stated, "I don't even feel like talking, man. I just, I just want to see my mom, dog." Rather than seeking to clarify what the defendant meant by that statement, one of the officers instead encouraged him to keep talking by asking, "Did you tell your mom what happened?" After additional questioning that included several more requests by the defendant to see his mother, the following exchange took place:

Defendant: "I'm done, I'm done talking now."

Interviewer: "Listen. I'm asking you a couple easy questions here."

Defendant: "No, no, I'm straight. I'm straight."

Interviewer: "You don't want to talk to me anymore?"

Defendant: "I mean, I want to s -- , if I could, if I could just see my mom. I just want to see my mom."

After officers continued to question him, the defendant said, "no, no, no, no, I want to talk to my mom, dude," and "I'm not gonna answer no questions until I talk to my mom." Questioning continued after these statements.

The motion judge acknowledged that the defendant claimed at several points that he was finished talking, but downplayed the importance of those claims because the defendant continued to speak with the police even after making them. That analysis is incorrect. Standing alone, the defendant's statement that he

"don't even feel like talking" might not have been sufficiently clear to invoke his right to silence.[13] Given that he was under arrest at the time, police did not have to allow him to see his mother.[14] In light of this initial request, however, the defendant's subsequent invocations of his right to silence were unambiguous and unequivocal. See Commonwealth v. Santana, 465 Mass. 270, 282 (2013) (defendant's postwaiver statement that he "couldn't say any more" invoked right to silence); Santos, supra at 285 (defendant's postwaiver statement, "I'm not going on with this conversation," invoked right to silence).

Police should have stopped questioning the defendant at least as soon as he stated that he was "done talking now." In failing to do so, they did not "scrupulously honor[]" his invocation of his right to silence. See Clarke, supra at 351-353, and cases cited.

---

[13] See Commonwealth v. Clarke, 461 Mass. 336, 351-352 (2012), quoting Davis v. United States, 512 U.S. 452, 461 (1994) ("When law enforcement officials reasonably do not know whether a suspect wants to invoke the right to remain silent, there can be no dispute that it is a 'good police practice' for them to stop questioning on any other subject and ask the suspect to make his choice clear").

[14] But see Commonwealth v. Smith, 471 Mass. 161, 162 (2015) (requiring "on a prospective basis" that seventeen year olds subject to custodial interrogation have opportunity to consult meaningfully with interested adult before waiving their Miranda rights).

iv. <u>Harmlessness beyond a reasonable doubt</u>.  Although the statements the defendant made after invoking his right to silence during the second interview should have been suppressed, their admission in evidence was harmless beyond a reasonable doubt.  See <u>Chapman</u> v. <u>California</u>, 386 U.S. 18, 24 (1967).  To determine whether erroneously admitted evidence was harmless, we consider factors such as "the importance of the evidence in the prosecution's case; the relationship between the evidence and the premise of the defense; who introduced the issue at trial; the frequency of the reference; whether the erroneously admitted evidence was merely cumulative of properly admitted evidence; the availability or effect of curative instructions; and the weight or quantum of evidence of guilt."  <u>Commonwealth</u> v. <u>Tyree</u>, 455 Mass. 676, 701 (2010) (<u>Tyree</u>), quoting <u>Commonwealth</u> v. <u>Dagraca</u>, 447 Mass. 546, 553 (2006).

The defendant continued to speak with police for approximately one and one-half hours after they failed scrupulously to honor his invocation of his right to silence.  After that invocation, the defendant admitted for the first time that he and his friends had planned specifically to rob a taxicab driver on the night of the shooting.  He also identified Milton as the person who had called the taxicab company, disguising his voice to sound like that of a female.  Furthermore, the defendant told one of the officers that he had

telephoned the officer after the first interview in order to confess, but that the officer had not picked up his telephone. The defendant was allowed to call his mother from one of the officer's cellular telephones during a break in questioning. During that call, which was captured by the audio-video recording device, the defendant told his mother that he accidentally had shot Conley.

However, before invoking his right to silence at the second interview, the defendant already had admitted to police that he had shot the taxicab driver, albeit by accident, after Fernandes instructed the driver to hand over his money. Other evidence overwhelmingly corroborated essentially that version of events: Milton testified that the defendant had proposed robbing a taxicab driver and showed him a gun several hours before the shooting; he further testified that, after the shooting, the defendant ran back to the Honda wearing only one shoe.[15] The defendant's other shoe was found at the crime scene and tested positive for Conley's blood. Witnesses also observed an individual running away from the crashed taxicab with a limp; in light of the abandoned shoe, this person reasonably could be inferred to be the defendant. In addition, Cruz testified that the defendant specifically had asked him to be his "alibi" for

_____

[15] As noted, see note 4, supra, Milton testified pursuant to a plea agreement.

the time of the shooting, and provided him with the same story about having been robbed himself that he told police during his first interview.  Because of the weight of this other evidence, the admission in evidence of the defendant's postinvocation statements was harmless beyond a reasonable doubt.  See Tyree, supra at 701.

b.  Admission of grand jury testimony.  The defendant argues that it was error to admit portions of the grand jury testimony of Resendes, the defendant's girl friend at the time of the shooting.  Before the grand jury, Resendes described her interactions with the defendant on the night of the shooting.  She also recounted statements that the defendant purportedly had made to her while he was being held at the police station after his arrest.  The defendant told her that "[i]t was an accident" and that "he probably is going to be doing a lot of time."  When called to testify at trial, however, Resendes repeatedly stated that she no longer had any memory of these matters.  The judge determined that Resendes was feigning memory loss, and allowed her grand jury testimony to be admitted substantively.

"It is an understandable concern . . . that grand jury testimony admitted at trial for substantive use be subject to a certain level of corroboration before a conviction can be based on it."  Commonwealth v. Sineiro, 432 Mass. 735, 744 (2000) (Sineiro).  Nonetheless, when a witness feigns memory loss, that

witness's statement before the grand jury may be admitted substantively if three general requirements are met:  "(1) there must exist an opportunity for effective cross-examination of the witness at trial; (2) the witness's statement must clearly be that of the witness, rather than the interrogator, and be free from coercion; and (3) some corroborative evidence must be presented."  Id. at 741, citing Commonwealth v. Daye, 393 Mass. 55, 73-75 (1984).

All three of those requirements were met in this case. The trial judge found that the defendant was able to cross-examine Resendes, and that Resendes's statements to the grand jury were hers rather than being merely affirmations of specific leading questions by the prosecutor.  In addition, the judge was presented with corroborative evidence of Resendes's grand jury testimony.  At a voir dire hearing, a victim witness advocate testified that Resendes had remembered the night of the shooting "clearly" when the advocate interviewed her one week before trial.  Although the advocate was not asked specifically to recall Resendes's statements about what the defendant told her at the police station, the advocate described at length other details of what Resendes had said during that conversation. Based on this information, the trial judge correctly found that Resendes's feigned memory loss was "affecting all aspects of her testimony."  The substantive admission of her grand jury

testimony, including her description of the defendant's statements at the police station, accordingly was proper. See Sineiro, supra at 744-745.

c. Violation of sequestration order. The defendant maintains that it was abuse of discretion to deny his motion to strike Milton's testimony after Milton violated the sequestration order.[16] Although Milton was in custody at the time of trial, his mother attended the proceedings the day before he was scheduled to testify. She then advised him over the telephone on how to testify based on what she had observed in court the previous day. Because Milton's trial testimony contradicted earlier statements he had made to police,[17] his mother suggested that if defense counsel accused him of lying, he should explain that he initially had lied to police because he was "scared." Milton followed his mother's advice when cross-examined by defense counsel. The remainder of Milton's testimony, however, was consistent with a prior written statement he had provided to police, and with a recorded interview.

---

[16] The Commonwealth argued at trial that the sequestration order had not been violated. On appeal, however, it does not dispute that a violation occurred.

[17] When first questioned by police, Milton said that he had been with his family at the time of Conley's death.

"[T]he remedy for violation of a sequestration order rests within the sound discretion of the judge." Commonwealth v. Bianco, 388 Mass. 358, 370 (1983). To establish that a judge abused his or her discretion in denying a motion to strike, a defendant must show that there was "'a clear error of judgment in weighing' the factors relevant to the decision, . . . such that the decision falls outside the range of reasonable alternatives" (citations omitted). L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

In this case, the remedy the judge employed did not fall outside the range of reasonable alternatives. Defense counsel was able to cross-examine Milton regarding his mother's advice, and counsel was provided with recordings of the conversations in which that advice was given in order to determine exactly how Milton's mother had coached him, so that counsel would be in a position to propose an adequate remedy.[18] The judge ultimately instructed the jury after the close of evidence that they could consider the fact that Milton's mother had told him to say he lied to the police when evaluating his testimony. Despite his earlier motion to strike Milton's entire testimony, defense counsel himself stated that he was "satisfied" with the instructional remedy. There was no abuse of discretion.

---

[18] The conversations were recorded by house of correction officials.

d.   Instruction on involuntary manslaughter.   The defendant asserts error in the judge's denial of his request for an instruction on involuntary manslaughter.   Essentially, he argues that an instruction on involuntary manslaughter was warranted because the jury reasonably could have found that the shooting was accidental and outside the scope of the alleged armed robbery.

The defendant has raised this issue only in the context of the theory of felony-murder, notwithstanding that the jury also were instructed on the theories of deliberate premeditation and extreme atrocity or cruelty.   Accordingly, we first consider whether an involuntary manslaughter instruction was warranted as a lesser included offense of murder under the theory of felony-murder.   Pursuant to our duty under G. L. c. 278, § 33E, we also consider whether a manslaughter instruction was warranted under the alternate theories of deliberate premeditation and extreme atrocity or cruelty.

"An instruction on [involuntary] manslaughter is required where any view of the evidence will permit a finding of manslaughter and not murder."   Commonwealth v. Jessup, 471 Mass. 121, 135 (2015) (Jessup), quoting Commonwealth v. Sires, 413 Mass. 292, 301 (1992).   "In deciding whether a manslaughter instruction is supported by the evidence, all reasonable inferences must be resolved in favor of the defendant."   Jessup,

supra, quoting Commonwealth v. Vanderpool, 367 Mass. 743, 746 (1975).

Resolving all inferences in favor of the defendant here, we conclude that an instruction on involuntary manslaughter was not warranted as a lesser included offense of murder in the first degree on a theory of felony-murder, but that such an instruction was warranted under the theories of deliberate premeditation and extreme atrocity or cruelty. Nonetheless, the absence of the instruction did not create a substantial likelihood of a miscarriage of justice.

For the jury to find a defendant guilty of murder in the first degree on a theory of felony-murder with armed robbery as the predicate felony, the killing must have occurred during the commission or attempted commission of an armed robbery.[19] See Commonwealth v. Evans, 390 Mass. 144, 151-152 (1983) (Evans). Nonetheless, "[w]here the felony-murder rule applies, generally the defendant is not entitled to an instruction on manslaughter." Jessup, supra at 135, quoting Evans, supra at 151. The defendant argues that the jury could have found that he did not commit the homicide while the felony was still ongoing. Pointing to the presence of blood on the taxicab's airbags, as well as testimony from witnesses who reported

---

[19] The jury were instructed accordingly.

hearing only one "bang" rather than a separate crash and gunshot, the defendant argues that the jury could have inferred that the impact of the vehicle during the collision caused the gun to go off after the robbery was over.

That argument, requiring speculation rather than reasonable inferences, does not withstand scrutiny.  For the jury to infer that any blood found on the airbags was the result of a postcollision shooting, they would have had to ignore evidence that Conley continued to bleed after the shooting.  They also would have had to ignore evidence that the airbags already had deployed when emergency personnel attempted to remove the bleeding Conley from his vehicle.  Any inference from the fact that witnesses heard only a single noise to the effect that the taxicab's collision therefore caused the gun to fire would have been similarly far-fetched.  To the contrary, extensive evidence, including the defendant's own recorded statement, indicated that the defendant jumped out of the vehicle before the collision, still in possession of the gun.[20]  Because the

---

[20] Before the defendant invoked his right to silence during the second interview, the following exchange took place.

Interviewer A:  "The, the car is moving right now.  You said [Conley] hit the gas.  He's pulling on the gun.  The gun went off, so the car is moving now right?"

Defendant:  "Yeah."

inferences the defendant suggests the jury could have made would not have been reasonable, the judge correctly rejected his argument regarding the scope of the felony.  See Jessup, supra at 135.

In Jessup, however, the jury were instructed only on murder in the first degree on a theory of felony-murder.  Id. at 135-136.  Because the jury were instructed on all three theories of murder in this case, the judge also should have considered whether involuntary manslaughter was a lesser included offense with respect to murder in the first degree on the theories of deliberate premeditation and extreme atrocity or cruelty.  We conclude that an involuntary manslaughter instruction was warranted on these theories.

"In a nonfelony-murder case, the fact that the shooting was accidental negates the malice element required for murder."  Commonwealth v. Griffith, 404 Mass. 256, 260 (1989).  The judge recognized the possibility of accident in this case:  the jury

---

> Interviewer B:  "Yeah, you guys are moving down the street at a pretty good clip, too, eventually."
>
> Interviewer A:  "What happens next?"
>
> Defendant:  "I hopped out."

Other corroborating evidence included eyewitness testimony that an individual was running with a limp at a substantial distance from the taxicab immediately after it crashed.  In addition, the defendant's shoe was found with Conley's blood on it at a substantial distance from where the vehicle finally crashed.

were instructed that an accident resulting in death would negate malice under the theories of deliberate premeditation and extreme atrocity or cruelty. The jury were not, however, similarly provided with a manslaughter instruction based on these theories. Such an instruction should have been given, because the jury reasonably could have concluded that the shooting was accidental, based on the defendant's statements to police that the gun discharged accidentally when the taxicab driver accelerated and grabbed at the defendant's hand. See Jessup, supra at 135.

Yet even if the jury also had been instructed on involuntary manslaughter as a lesser included offense, the evidence supporting a conviction on the theory of felony-murder was overwhelming, and the jury ultimately convicted the defendant on this theory. "A defendant who kills a victim in the commission or attempted commission of a robbery, while the defendant is armed with a gun, is guilty of murder by application of the felony-murder rule. . . . The fact that, according to the defendant, the gun was discharged accidently is of no consequence." Evans, supra at 151-152. As noted, supra, the defendant admitted to police that he shot Conley by accident after his codefendant told Conley to hand over his money. See Commonwealth v. DiGiambattista, 442 Mass. 423, 447 (2004) (noting "exceptionally potent quality of a defendant's statement

or confession" as evidence).  Milton's testimony similarly established that the defendant had proposed robbing a taxicab driver and was in possession of a gun several hours before the shooting.  In light of this evidence, the absence of an involuntary manslaughter instruction did not create a substantial likelihood of a miscarriage of justice.

e.  <u>Relief pursuant to G. L. c. 278, § 33E</u>.  We have examined the record carefully pursuant to our duty under G.L. c. 278, § 33E, and discern no basis on which to grant the defendant relief.

<u>Judgment affirmed</u>.